## No. 16,084.

HYMAN AND COMPANY ET AL. *v.* VELSICOL CORPORATION.

(233 P. [2d] 977)

Decided May 28, 1951. Rehearing denied June 25, 1951.

564

Mr. Raymond F. Adams, Mr. Irving Hale, Jr., Mr. Donald S. Stubbs, Mr. Louis E. Gelt, Mr. Sydney H. Grossman, Mr. Percy S. Morris, for plaintiffs in error. Messrs. Adams, Forward & McLean, Messrs. Lewis, Grant, Newton, Davis & Henry, of counsel.

Mr. Floyd E. Thompson, Mr. Clyde E. Shorey, Mr. John R. Coen, for defendant in error. Messrs. Poppenhusen, Johnston, Thompson & Raymond, Follansbee, Shorey & Schupp, of counsel.

*En Banc.*

Mr. Justice Alter delivered the opinion of the court.

Velsicol Corporation, organized under the laws of Illinois, brought an action against Julius Hyman & Com-

pany, a Delaware corporation, authorized to and conducting its business in the State of Colorado, Julius Hyman, individually and as president and director of Julius Hyman & Company; Robert Silber, individually and as secretary and director of Julius Hyman & Company; Harriet Sims Hyman, individually and as treasurer and director of Julius Hyman & Company; James A. Bailey, Sidney Bartlett, Charles A. Beckwith, Daniel E. Bonnell, Charles C. Compton, Nick D'Amore, Abe Danish, Edward Despres, Henry Dudlak, Ernest Freireich, Gerald B. Griffin, Beatrice Page Howerton, Lloyd Joshel, Clyde W. Kearns, Rex E. Lidov, Laverne Martin, William E. McCauley, Thomas McKenna, Roy J. Miller, John Montgomery, Carmen Nelson, Steve Pocsik, Howard Rosenbaum, Yuji Tajima, Anne C. Tovey, Kenneth M. Watson, James F. White, Fritz Wolf and Simon Zevin, to obtain an injunction against defendants, and each thereof, enjoining and restraining them from manufacturing and selling certain insecticides and from disclosing to others the formulas, processes and products used in the manufacture of said insecticides; further requiring defendants to account to plaintiff for gains and profits resulting from the manufacture and sale of certain insecticides; for damages to plaintiff resulting from unfair competition in the sale of certain insecticides, and by wrongful use of plaintiff's trade secrets, trade marks and names. Upon trial judgment was entered in favor of plaintiff and against defendants; the latter bring the cause here for review by writ of error.

We will herein refer to the litigants as plaintiff and defendants as they appeared in the trial court, or by name.

In the injunctive feature of this action, there is involved the right of defendants to manufacture and sell certain insecticides discovered and invented in plaintiff's research and experimental laboratories by the individual defendants, or some of them, while all of the individual defendants, it is alleged, were under a contractual and

fiduciary relationship with plaintiff requiring secrecy during their employment and thereafter, and under contractual obligation to assign to plaintiff any discovery or invention while so employed. The inventions and discoveries here involved are embraced in applications for United States Letters Patent Serial Nos. 581172, 607078, 639416, 643759, 648204 and 648205. Said applications Nos. 581172 and 639416 have been duly assigned to plaintiff, while applications 607078, 643759, 648204 and 648205 are on file in the United States patent office in the name of defendant Julius Hyman as the inventor, who has refused to assign the same to plaintiff, conceding, however, plaintiff's "shopright" to manufacture and sell the same. All the products embraced under these patent applications necessarily used in the manufacture of an insecticide variously known as Velsicol, Velsicol 1068 and Octa Klor, and commercially referred to as chlordane.

At the conclusion of the trial, judgment of dismissal was entered in favor of defendants Clyde W. Kearns, Kenneth M. Watson, Charles C. Compton, James A. Bailey, Sidney Bartlett, Laverne Martin, John Montgomery, Carmen Nelson, Beatrice Page Howerton, Anne C. Tovey, Gerald B. Griffin, Harriet Sims Hyman, and Lloyd Joshel. On the injunctive feature of the case, the court's judgment and decree was in favor of plaintiff.

The record consists of nine volumes, comprising more than 6,000 folios, with more than one hundred exhibits, many of which are lengthy, detailed and complicated financial and statistical reports. It is obvious that a detailed resume of the evidence would unduly lengthen this opinion.

Except as specifically otherwise noted, the record discloses the following undisputed facts: In the latter part of 1930, Dr. Hyman, a highly educated chemist, approached Joseph Regenstein and F. P. Schneider to interest them in financing a research and experimental laboratory for the exploitation and development of two patents and processes discovered and invented by him.

These two products and processes resulted from the use of certain polymers, by-products of petroleum, which came to Hyman's attention while employed as a chemist in the oil industry. Joseph Regenstein and F. P. Schneider became interested in financing the development and exploitation of Hyman's patents, and it was agreed between the three persons named that the patents should be assigned to a corporation to be organized, with a capitalization of two hundred shares of the par value of $100.00 each. Pursuant to this agreement, in January, 1931, the Varnoil Corporation, the name of which was subsequently changed to Velsicol Corporation, was organized under the laws of the State of Illinois. The Transo Envelope Company, in which Joseph Regenstein was a principal stockholder, and F. P. Schneider also was a stockholder, subscribed for, and to it there was issued a certificate for seventy-eight shares of stock; the Arvey Corporation, in which Joseph Regenstein also was the principal stockholder, subscribed for a certificate for seventy-eight shares and the same was issued to it; Julius Hyman subscribed for and received a certificate for forty shares, representing the agreed value of his two patents which were assigned to the corporation; Joseph Regenstein, F. P. Schneider, Henry Degginiger and Sidney J. Blum each subscribed for and received certificates for one share.

The objects and purposes for which the Varnoil Corporation was organized, as disclosed by its Certificate of Incorporation, were, inter alia:

"To manufacture, produce, invent, export, import, develop, use, buy, sell and generally deal in and with, at wholesale and/or retail, as principal, agent, broker, and/or jobber, oils, paints, pigments, varnishes, dyes, coloring matter, acids, solvents and chemicals of all kinds.

\* \* \*

"To apply for, secure, obtain, register, purchase, create, lease or otherwise acquire and to hold, use, own, operate and introduce, and to sell, assign, lease on royalty or

otherwise dispose of, any letters patent, patent rights, patent applications, licenses or grants in respect to letters patent or patent applications, inventions, improvements, processes, formulas, trade marks and trade names, copyrights, labels and designs, issued by, used in connection with or secured under, letters patent of the United States, or any foreign country, or otherwise, and to use, exercise, develop, grant licenses and territorial rights in respect of, sell, or otherwise turn to account any such patents, applications, licenses, processes, formulas and inventions or the like, or any such trade-marks, trade names, copyrights, labels, designs, property or rights, including the good will of any thereof, and to supervise or otherwise exercise such control over its said licensees and the business conducted by them, as may be agreed upon in its contracts with such licensees for the protection of its rights in said patents or other property and rights, and to secure to it the payment of agreed royalties or other considerations; and to manufacture, buy, sell, or deal in any article produced as the result or through the use of, any such inventions, processes, or the like or under any such patent, or any articles of any description used, or suitable to be used in connection therewith."

Julius Hyman was elected vice-president and director of the corporation, and from its organization until his resignation on September 13, 1946, had sole and exclusive charge and control of its experimental and research laboratory and its manufacturing facilities. It was he who employed chemists and other technical employees, and also he determined the projects to which they should devote their time and attention. In the inception the research and experimental work of the corporation was conducted in a building of the Arvey Corporation with three employees other than Hyman, two of whom were chemists. Each of these employees was required to execute an employment agreement, not only with Varnoil but also with Transo Envelope Company

covering the operations and secret processes used. The first of these employment agreements with Varnoil specified "inventions, improvements, discoveries, formulas or processes relating to oils, paints, varnishes or any of the ingredients or products thereof or relating to the manufacture or production" thereof and that the corporation should be the sole and absolute owner of the same; they further provided for secrecy thereof. The first employment agreement, as well as two modifications thereof, subsequently used by the corporation, provided for secrecy as to all processes, inventions and formulas made known to the employee by the company or any of its officers or employees or which were learned by him while employed by the company, and that no disclosure thereof should be made except by written authorization of the president of the company.

The second form of employment agreement concerned the discovery, development and invention of processes, formulas and methods relating to hydrocarbons and the ingredients and products thereof, and the third form related to discoveries, formulas or processes relating to "resins, insecticides and all other chemical derivatives of hydrocarbon oils, as well as catalysts for the conversion of hydrocarbon oils."

It was provided in all three employment agreements that all inventions, improvements, discoveries, formulas or processes discovered by the signatory thereto should be assigned to and become the property of the employer corporation, and, as we have said, all three contained secrecy provisions.

The employees of Velsicol, including all of the defendants in the present action, executed one or more of the three forms of employment agreements.

Julius Hyman, in January, 1931, signed an employment agreement on a form provided by the Transo Envelope Company modified so as to make the secrecy provision thereof applicable to Varnoil Corporation, and while there is positive evidence that in January, 1931, he

also signed the first form of employment agreement with Varnoil, it was not produced as an exhibit at the trial, and the execution thereof is denied by him.

From the organization of the company and until 1940, its business was conducted at a loss. At the close of business in 1943 the surplus account was $32,559.00. From 1932 until 1940 Transo Envelope Company and Arvey Corporation provided funds for Velsicol with which to carry on the work in the research and experimental laboratory and to construct a plant in which to manufacture its products which were other than the insecticides involved in this proceeding. By 1940 Transo Envelope Company had advanced to Velsicol $264,000.00, and a like sum had been advanced by Arvey Corporation, which sums remained due and owing to said corporation on September 13, 1946, when Dr. Hyman resigned.

In 1943 Dr. Hyman, then in full charge of the day to day operations of Velsicol, took no part in the work in the research and experimental laboratory but assigned it to others; caused Dr. Herzfeld to be assigned to work on a project which resulted in the discovery in 1945 of a new composition of matter designated as "237" and which is an intermediate product made in the course of manufacturing Velsicol 1068 or chlordane.

Dr. Lidov and Mr. Bluestone, other chemists employed by Velsicol, were assigned with Dr. Herzfeld to make further research and development relative to "237." The application for United States Letters Patent No. 581172 covering "237" was filed March 5, 1945, with Dr. Herzfeld, Dr. Lidov and Mr. Bluestone named as inventors, and this application was duly assigned to Velsicol.

The product "237" was found to be defective in stability, toxicity and volatility and Dr. Hyman directed that it be chlorinated, and this was done. On July 25, 1945, Dr. Hyman, as the inventor, filed application for United States Letters Patent Serial No. 607078 covering chlorinated "237." He failed to assign this application to

Velsicol. The empirical formula of chlorinated "237" is $C10H6CL8$, and the product came to be known as "1068." During the course of the filing of the applications in dispute Dr. Hyman instructed plaintiff's patent attorney to register "Velsicol", "1068", and "Veliscol 1068" under the trade-mark law.

Dr. Hyman says that he told Joseph Regenstein sometime in September or October, 1945, that he had not assigned the "1068" patent application, Serial No. 607078, and that he would not assign it until some new arrangement had been agreed upon between them with respect to his interest in Velsicol Corporation, and that Regenstein declined to discuss the matter. During the latter part of 1945, according to Dr. Hyman, his salary was increased to $600.00 a week retroactive to January 1, 1945, it theretofore having been fixed at $350.00 a week. This increase, he testified, was with Joseph Regenstein's consent and approval. As a result of this increase, Dr. Hyman's yearly salary was augmented by $13,000.00, and, incidentally, during the year 1945 he was credited with an expense allowance in excess of $8,400.00. All research and experimental work in connection with application Serial No. 607078, as well as all other research and experimental work conducted in Velsicol's laboratory, and the construction and operation of its manufacturing plant, were kept in strict secrecy so far as secrecy was possible. Subsequently, and on January 5, 1946, Dr. Herzfeld, Dr. Lidov and Mr. Bluestone filed a second application for United States Letters Patent Serial No. 639416 as a protective or broadening coverage on the product heretofore referred to as "237." On January 26, 1946, Dr. Hyman, as the inventor thereof, filed an application for United States Letters Patent Serial No. 643759, which related to his first patent application Serial No. 607078 and which broadened its field. This application he refused to assign to Velsicol.

Dr. Hyman, on February 16, 1946, as the inventor, filed applications for United States Letters Patent Serial Nos.

648204 and 648205 covering other products and processes. These applications Dr. Hyman likewise refused to assign to Velsicol. Large sums of money were expended by Velsicol in connection with work in its research and experimental laboratory, and in 1945, and proportionately in 1946, prior to Dr. Hyman's resignation, it had expended $200,000.00 per year largely in the research and experimentation of the inventions and discoveries covered by the patent applications heretofore mentioned. It also had expended more than $100,000.00 in testing and proving the insecticides covered by said patent applications.

All of the applications for patents here involved, as well as those filed in foreign countries, were filed by Velsicol's patent attorney at the specific direction or with the definite approval of Dr. Hyman, and all thereof covered products and processes which were discovered and invented in Velsicol's experimental and research laboratory by employees of Velsicol Corporation under the direction of Dr. Hyman.

Prior to July, 1943, Dr. Hyman as the inventor thereof, had filed thirty-seven applications for United States Letters Patent and had assigned each thereof to Velsicol, all of which applications were based upon discoveries and inventions made by him in the course of his employment with Velsicol.

In September or October, 1943, while Dr. Hyman was a guest at the home of Joseph Regenstein, he stated that he did not feel that he wanted to assign further patents to Velsicol without a greater remuneration and that his salary, then $350.00 per week, was for services "as the operating head of the company" to which Joseph Regenstein replied, "Well, if that is the way you feel about it, we might as well call the whole business quits right now." Whereupon Dr. Hyman consented to' assign further applications to Velsicol upon Joseph Regenstein's assurance that Dr. Hyman would be "taken care of."

Thereafter Dr. Hyman assigned three applications for

patents to Velsicol, the last of which was filed on September 22, 1944, being a date prior to the filing dates of any patent applications here in question.

In February, 1944, Dr. Hyman, as executive vice-president of Velsicol Corporation, filed with the Salary Stabilization Unit of the Internal Revenue Department a verified "Employer's Application for Approval of Salary Adjustments" in which he stated that Velsicol Corporation was engaged in manufacturing chemicals from petroleum; that this was done in its refinery and research laboratories, and that in said industry the kind of products made were synthetic resins, solvents, *insecticides* and petroleum chemicals. In support of this application and attached thereto is Dr. Hyman's statement in which we find, inter alia, the following:

"The steady growth of the company, continued expansion of its products and the development of new materials and products involved, not only, an increase in plant facilities and numbers of employees, but necessarily required an increase in the duties and responsibilities of the latter. * * * Indicative of this growth is the increase in the number of employees from 93 in 1942 to approximately 200 at this time.

"In the early formative days, particularly, when the financial means of the company were limited, the policy was adopted to attract competent and technically trained men by holding forth to them the rewards which would be theirs if they would become associated with this process on the basis of accepting modest remuneration with substantial increases and bonuses as success was achieved. * * *

"The reasons underlying such an employment policy are readily understandable when it is realized that the profits of the company are entirely dependent upon the ingenuity and efforts of its technical employees and scientists who must constantly develop new products, overcome resistance of customers to new products and new materials and require the solution of the problems

of the customers which arise in connection with the use of Velsicol products. * * *

* * *

"By August, 1943, the research activities of Velsicol Corporation had expanded so that Dr. Hyman, in addition to being *Director of Research* and also *General Manager* of the corporation, required the services of a competent individual whose exclusive task it would be to supervise all *research activities, under the general direction of Dr. Hyman.* Thereupon, Dr. Rex E. Lidov, who holds a Doctor of Philosophy degree in chemistry, granted by the University of Chicago, was engaged as Assistant Director of Research. * * *

"Included in this classification [research chemists] are three chemists who hold Ph.D. degrees in chemistry from the University of Chicago, the balance of the research chemists all holding bachelor or masters' degrees in chemistry from recognized universities. Their duties, as their title implies, consist of the research and development of new products as well as new uses for the company's present products. The procedure of the company is to *assign a chemist to a particular project, and from that point on, it is up to the individual chemist to use his own particular ingenuity and skill.* * * * *it should be noted that all patents and discoveries of these employees become the property of Velsicol Corporation, and the only financial reward for valuable discoveries is the salary and bonus paid to these employees.*

"The duties of the control chemists, who are stationed at the company's refinery at Marshall, Illinois, are to analyze chemically all incoming materials and all materials being manufactured by the company in the various stages of production. Prior to the middle of 1943, the company never had permanently stationed at Marshall any graduate chemist to control and supervise this important work. * * *

"Both of the chemical engineers employed by the corporation hold masters' degrees in chemical engineering.

It is the function of Mr. Wien to *design and supervise the construction of all equipment used by the laboratory in Chicago, and to prove on a 'pilot plan basis' the commercial practicability of any processes developed in the 'test tubes.'* Once the feasability of a new process has been demonstrated through pilot plant operation in Chicago, Mr. Freireich *must design equipment for the commercial production of the particular product at the Marshall refinery.* Both of these positions *require a great deal of individual ingenuity and skill,* and both individuals employed by the company have acquired considerable experience in the petroleum and chemical industry. * * *

"The company has followed the practice of *constructing its own equipment,* all of which is *designed by its own chemical engineers,* as this results in a substantial savings over the cost if built by outside contractors. * * * The company is entirely dependent upon the *goodwill of its 'key' employees at the Marshall, Illinois, plant,* and the successful operations of the *refinery are due to their loyal efforts on behalf of* the company." (Emphasis supplied.)

The statement attached to the "Employer's Application for Approval of Salary Adjustment" emphasizes the necessity for experienced, educated and highly trained chemists, bacterial research chemists, control chemists, chemical engineers, construction engineers, sales managers, industrial engineers and cost accountants, purchasing agents, sales correspondents and advertising managers, manager, plant superintendent, assistant plant superintendent, foreman and outside technical advisers, vice-president in charge of production, and like educated, trained and experienced employees in its Marshall, Illinois, plant.

On May 25, 1945, Dr. Hyman verified a supplemental request and filed the same with the Salary Stabilization Unit of the bureau of Internal Revenue for a ruling on

the wages and salary applicable to himself and Col. Behrman, of which the following is a part:

"Dr. Hyman is the *principal executive officer of Velsicol Corporation.* Velsicol Corporation was founded in 1931 to exploit and develop certain patents invented by Dr. Julius Hyman. During the entire history of Velsicol Corporation, *Dr. Hyman has determined the research activities, policies and general business activities of the company.* * * * *Because Dr. Hyman was more concerned with scientific problems, the solution of which would result in substantial profit for the corporation, he has never pressed the question of personal reward.* * * *

"Velsicol Corporation is the only company in the United States manufacturing resins from petroleum waste by-products as its main product. In addition, *insecticides,* core oils and other products are manufactured by *special processes developed under Dr. Hyman's leadership.* The development of products which are unique to Velsicol Corporation involved a long period of financial losses and strain upon the company. As a result, the company had an operating deficit at January 1, 1940, of $203,253.22. It was not until December 31, 1943, following the first four years of profitable operations of the company, that this deficit was absorbed. *In addition,* the company still owes Arvey Corporation and Transco Envelope Company the amount of $594,980.88, and has been unable to make any payments on this obligation." (Emphasis supplied.)

In June, 1946, Joseph Regenstein, his son, and Dr. Hyman met in New York to discuss the sale of Velsicol Corporation to Sun Chemical Corporation. Dr. Hyman took with him a sample of chlordane, with reference to which he stated that this product alone was worth more than the $4,000,000.00 which was the asking price for Velsicol Corporation. The product which Dr. Hyman then was exhibiting was covered by the six applications for patents hereinbefore mentioned, and "237" was, as is admitted, an intermediate product thereof.

It is admitted that all inventions and discoveries made by Velsicol's research chemists in its research and experimental laboratory prior to July 25, 1945, were duly assigned to Velsicol, and likewise it is admitted that all of the year 1945 and eight months of 1946 were spent in getting chlordane or Velsicol 1068 into commercial production at Marshall, and this had not been accomplished prior to Dr. Hyman's resignation.

In the summer of 1946, Dr. Hyman called Mr. Regenstein's attention to the fact that he had not assigned application for United States Letters Patent Serial Nos. 607078 and 643759 to Velsicol and would not do so until some new arrangement had been made between them, at which time Mr. Regenstein refused to discuss the subject, and, according to Dr. Hyman—but denied by Mr. Regenstein—these negotiations continued until September, 1946.

It is admitted that on the afternoon of September 13, 1946, Julius Hyman called a meeting of scientific and technical employees in Velsicol's Chicago office to announce his resignation, and there is a decided conflict as to what he stated to the assemblage. According to Dr. Hyman there was in attendance at this meeting the research chemists and other key employees of Velsicol; he stated to them that he was leaving the company, and proceeded to recount his reasons for so doing, tracing the history of the company from its organization. He stated that he had refused to sign an employment agreement containing provision for secrecy and assignment, and that, while he was not bound to do so, he had in the past assigned patents for the purpose of getting Velsicol on a solid financial basis; that while his plans for the future were indefinite, he contemplated a company of his own, and, if he organized one, he invited them to join him in the new venture; that he hoped that those assembled might be given an opportunity of sharing in the profits of Velsicol by a stock distribution plan, but that that had not materialized. He further stated that

if a new company was formed he might be able to inaugurate some profit sharing plan by stock distribution.

The deposition of Dr. Morton Kleinman, an organic research chemist employed by Velsicol, was offered in evidence. With reference to the Chicago meeting on September 13, 1946, when Dr. Hyman's resignation and the reasons therefor were explained to the research and development chemists, together with some technicians, in number about twenty or twenty-five, Dr. Hyman's statement as to the occurrences, in so far as given, were substantially correct. However, in addition, Dr. Kleinman testified that Dr. Hyman stated that when Mr. Regenstein refused to inaugurate a profit sharing plan for the employees of Velsicol he decided then to hold out his assignment of the patent Velsicol 1068 in an effort to force an agreement, and that having failed in this he was resigning and was planning on forming a new competitive organization of his own. Dr. Hyman further stated that there was a question as to how long research would be continued by the Velsicol Corporation, and that it was uncertain how long Col. Behrman would remain as a director of research but probably not very long. Dr. Hyman also stated, according to this witness, that he expected his new competitive company would shortly be formed and operating as he had persons interested in investing capital, and that as soon as his new corporation was organized any of them who wished might receive employment in the same capacity as then occupied with Velsicol, and he assured them that any who desired to join him in his new venture would be given a chance to purchase stock. According to Dr. Kleinman, after the meeting Dr. Hyman stated to him and Dr. Lidov that in his opinion Velsicol Corporation would not continue in business after his resignation, especially after all chemists left, and he stated, "that he had already instructed people, key people at Marshall, and was suggesting to those of us, that is, the few of us who remained there at that moment, as well, to do very

little work, or produce as little as possible, and confuse the normal operations of either research or with respect to Lidov's production down at Marshall as much as possible; and that at that moment they were probably already partly on the way to having production interrupted." Dr. Hyman and Dr. Lidov both emphatically denied the testimony of Dr. Kleinman with reference to the statements made by Dr. Hyman at the close of the meeting.

It is undisputed that on the day following Dr. Hyman's resignation the file case in Velsicol's Chicago office was completely empty, and the divider labels indicated, among others, the following filing spaces: "Julius Hyman—Velsicol report 12 June 1945" "Finances" "Laboratory" "Materials" "Velsicol Insecticides" "Velsicol Resins" "Velsicol Solvents" "Raw Materials" "Patents" "Real Estate" "Technical" "Research." Dr. Hyman stated he had removed only his personal files therefrom.

Immediately following Dr. Hyman's resignation, Joseph Regenstein consulted with officers of a Chicago bank, to which Velsicol Corporation was then indebted in excess of $600,000.00 upon arrangements made by Dr. Hyman. He also apprised these officers that Velsicol Corporation was indebted to Transo Envelope Company and Arvey Corporation in the sum of $528,000.00, evidenced by notes, and in excess of $40,000.00 on an open account, and in addition thereto that Dr. Hyman had committed Velsicol to the purchase of a plot of ground and the erection of an office and laboratory building thereon which would cost not less than $450,000.00. The officers of the bank were concerned about its loan to a corporation with a capital of $20,000.00, and at their suggestion, the indebtedness of the bank was guaranteed by Transo and Arvey corporations, and the officers then suggested that Velsicol's indebtedness to the last named corporations should be evidenced by capital stock in

Velsicol which would necessitate a recapitalization, accomplished as will hereinafter appear.

While the ownership of applications for United States Letters Patent Nos. 607078, 643759, 648204 and 648205 are not involved in this action, nevertheless it is to be noted that on October 15, 1946, an action was begun in the Superior Court of Cook County, Illinois, entitled "Velsicol Corporation v. Julius Hyman" to compel Dr. Hyman to assign four applications for patents then pending in the United States patent office; for an injunction restraining him from using or disclosing the processes, formulas, methods and products covered by said applications to anyone other than Velsicol, and from in anywise using or revealing the processes, formulas and methods or products invented or discovered by him while employed by Velsicol. The judgment and decree of said Superior Court provides, inter alia:

"4. Defendant, Julius Hyman, shall forthwith assign and transfer to plaintiff, Velsicol Corporation, application for United States Letters Patent Serial No. 607,078, filed by Julius Hyman July 25, 1945, application for United States Letters Patent Serial No. 643,759, filed by Julius Hyman January 26, 1946, and applications for United States Letters Patent Serial Nos. 648,204 and 648,205, filed by Julius Hyman February 16, 1946, and all applications for letters patent filed in foreign countries corresponding to the aforesaid applications for United States letters patent, and all patents which have issued or which may issue on any of said applications. * * *

\* \* \*

"6. Defendant, Julius Hyman, and his assignees, attorneys and agents are enjoined and restrained forthwith from using the processes, formulas and products covered by said applications for United States Letters Patent Serial Nos. 607,078, 643,759, 648,204, and 648,205, *and from disclosing said processes, formulas and products to anyone other than plaintiff, and from assigning*

*said applications to or permitting the use of said proc-
esses, formulas or products by anyone other than plain-
tiff, and from using or revealing any processes, formulas
or products and methods and technique of manufacture
discovered by or made known to him while he was in
the employ of plaintiff or which he has learned from
any other person now or formerly in the employ of
plaintiff; and a writ of injunction is ordered to issue ac-
cordingly."* (Emphasis supplied.)

Julius Hyman appealed the judgment of the Superior
Court to the Appellate Court, First District, and therein
the judgment of the Superior Court was reversed with
directions to dismiss Velsicol's complaint for want of
equity. *Velsicol Corp. v. Julius Hyman,* 338 Ill. App. 52,
Velsicol thereupon appealed from the judgment of the
Appellate Court, supra, to the Supreme Court of Illinois,
wherein, "The judgment of the Appellate Court is there-
fore reversed and the decree of the superior court is
affirmed. *Velsicol Corp. v. Julius Hyman,* 405 Ill. 352,
90 N.E. (2d) 717; certiorari denied, 339 U. S. 966, 70 Sup.
Ct. 1002, 94 L. Ed. 1374.

In October, 1946, Dr. Hyman learned of the Rocky
Mountain Arsenal near Denver, Colorado, and came to
that city with Dr. Freireich, Dr. Lidov, James F. White
and Lloyd Joshel, all of whom were chemists or chem-
ical engineers then or immediately previously thereto em-
ployed by Velsicol, and Robert Silber, who was then or
immediately previously had been retained as Velsicol's
attorney. Those former employees of Velsicol who be-
came associated with Dr. Hyman prior to the incorpora-
tion of Julius Hyman & Company were furnished funds
by Dr. Hyman, and as soon as Julius Hyman & Company
was incorporated, they were placed on its payroll.
Negotiations were conducted by Dr. Hyman for a lease
on the Rocky Mountain Arsenal which ultimately re-
sulted in its execution on January 7, 1947.

Prior to the execution of the lease, and on the 9th day
of November, 1946, Julius Hyman & Company was

incorporated under the laws of the State of Delaware and authorized to do business in the State of Colorado on the 5th day of December, 1946, the objects and purposes of which, as stated in its articles of incorporation, are generally similar to those of Velsicol Corporation.

In December, 1946, prior to the production of any chlordane by Julius Hyman & Company, it engaged in an extensive advertising campaign, naming its product Octa Klor, which admittedly is the same product theretofore manufactured and sold by Velsicol under its trade name "Velsicol," "Velsicol 1068" and "1068" and commonly referred to by both Julius Hyman & Company and Velsicol Corporation as chlordane. In December, 1946, although the first production of Octa Klor was March 17, 1947, Julius Hyman & Company published its price list. In its advertisements the empirical formula $C10H6CL8$ was prominently displayed, and Octa Klor was said to be chlorinated hydrocarbon insect toxicant discovered by "Dr. Julius Hyman, formerly Executive Vice-President of Velsicol Corporation and now President of Julius Hyman & Company." Further in its advertisements it was stated, "Julius Hyman & Company is composed of a group of scientists, engineers, technicians, and other key personnel who have worked together many years, and who possess the knowledge and competence required to produce $C10H6CL8$, and the understanding needed to serve the insecticide industry."

In the issue of a Journal of Economic Entomology in December, 1945, and available to the public a couple of months later, there was an article announcing, "A New Chlorinated Hydrocarbon Insecticide." The authors of the article were Dr. C. W. Kearns, Dr. Lester Ingle, and Dr. Robert L. Metcalf. At the time of the publication, Dr. Kearns was an employee and consultant of Velsicol; Dr. Ingle was a professor at the University of Illinois, and had a monetary interest in a fellowship contribution being made to that university by Velsicol; Robert L. Metcalf was with the Tennessee Valley Authority and

was given compensation by Velsicol in the form of an honorarium or retainer. All three men had been engaged in making tests at the request, and expense, of Velsicol Corporation by direction of Dr. Hyman. The article above mentioned described the compound as chlorinated hydrocarbon, having the empirical formula C10H6CL8, immediately following which was a reference to note 1, an examination of which disclosed the following: "Velsicol Corporation, Chicago, Illinois, U.S.A. patents pending."

Subsequent to September 13, 1946, when Dr. Hyman resigned as executive vice-president, general manager and director of Velsicol Corporation, and beginning in October, prior to the incorporation of Julius Hyman & Company, a number of Velsicol's technical and scientific employees resigned from that company and joined with Dr. Hyman in preparing to manufacture the discoveries and inventions covered by the six patent applications involved in this action.

Julius Hyman & Company, at its plant at the Rocky Mountain Arsenal, began operations in the latter part of February, 1947, with its first production on March 14, 1947. From March 14, 1947, to and including December 31, 1947, the company produced 1,251,364 pounds of chlordane; during 1948 1,513,697 pounds; and in January, February and March, 1949, 1,095,660 pounds. The gross proceeds derived from the sale of chlordane or Octa Klor and raw materials and scrap from March 14, 1947, to March 31, 1949, it is said, totaled the sum of $4,273,-980.55, and the cost of production and sale is stated to be $3,497,021.29. During this entire period Julius Hyman & Company were plaintiff's only competitor in the manufacture and sale of the product covered by the patent applications hereinbefore mentioned.

Application for United States Letters Patent Nos. 607078, 643759, 648204 and 648205 have not been assigned to Julius Hyman & Company, Dr. Hyman having stated

that he was under contract to assign them "in the event they are ruled as belonging to me."

Julius Hyman, individually, and as one of the defendants, in a fifth defense in his answer, attacks the validity of the recapitalization of Velsicol. On December 3, 1946, a special meeting of the board of directors of Velsicol was called, at which meeting a resolution pertaining to the recapitalization of the company was adopted. The matters recited in this resolution, so far as important, here are: The indebtedness of Velsicol to the bank then amounted to $1,125,000.00, payment of which had, subsequent to September 13, 1946, and at the request of the creditor bank, been guaranteed by Transo Envelope Company and Arvey Corporation, and, in addition thereto, Velsicol Corporation was then indebted to the two corporations last named in the sum of $528,000.00. It was provided in the resolution that the par value of the shares of stock in Velsicol should be reduced from $100.00 to $10.00 and the capital stock increased from 200 to 100,000 shares. Each stockholder in Velsicol was to receive ten shares of the new stock for each original share then held by him, and in addition each stockholder was permitted to purchase stock to the amount of $3,400.00 par value in new stock for each $100.00 thereof invested in Velsicol stock, and it was further provided that if a stockholder failed to exercise the privilege of purchasing additional stock, the same might be purchased by any other person at its par value. A copy of the resolution so adopted by the board of directors, together with a notice of the special meeting of the stockholders to be held on December 16, 1946, was delivered to each stockholder, and at the special meeting of the stockholders held as provided in the notice, all of the outstanding capital stock of Velsicol Corporation was represented; that of Julius Hyman being represented by his proxy, Rudolph M. Mulfinger, who was the only one present voting against the adoption of the resolution. Dr. Hyman neglected to avail himself of the opportunity

of purchasing additional stock. Transo Envelope Company and Arvey Corporation exercised their rights, and thereupon they surrendered and cancelled the notes of plaintiff, amounting to $528,000.00 and by the payment of $16,000.00 in cash, 54,400 shares of the capital stock of Velsicol, par value $10.00 per share, was delivered to them.

The controversy between Dr. Hyman and Velsicol as to the recapitalization of the Velsicol Corporation was held by the trial court not to be an issue determinable in the action here; nevertheless it may not be improper to call attention to the fact that the validity of the recapitalization of Velsicol has become the subject of litigation in the Illinois courts in an action wherein Dr. Hyman is plaintiff and Velsicol Corporation and others are defendants. The Illinois trial court held the recapitalization proceedings invalid in its judgment and decree of May 2, 1950, as appears from the record before us. However, by motion duly filed herein, our attention has been called to the fact that the judgment and decree of the trial court was, on January 31, 1951, reversed by the Appellate Court of Illinois, First Division, which remanded the cause to the trial court with instructions to set aside its judgment and decree and enter a decree in Velsicol's favor, 342 Ill. App. 489, 97 N. E. (2d) 122. The Supreme Court of Illinois has denied leave to appeal from this judgment, and it is now a final adjudication of the rights of the parties hereto.

With few, if any, exceptions, all of the individual defendants in the present action were invited, solicited or importuned by Dr. Hyman, or by others at his suggestion, to discontinue their employment with Velsicol Corporation and enter the employment of Julius Hyman & Company either before its organization was perfected or immediately subsequent thereto. In October, November and December, 1946, there was an exodus of Velsicol's employees to Denver to enter the employment of Julius Hyman & Company. All of the individual defend-

ants were either chemists, chemical engineers or otherwise experienced in the manufacture of chlordane, and while employees of Velsicol had acquired knowledge of the discoveries and inventions covered by the applications for patents herein involved or the unique processes by which chlordane was manufactured or the particular use thereof, and none of whom acquired any knowledge of chlordane by consideration of the patent applications. It is admitted that all of the individual defendants in this litigation, except Dr. Hyman, had signed one or more of the employment agreements under which they had pledged themselves to secrecy with reference to formulas, processes and other information respecting the same, acquired as an employee of Velsicol Corporation, and all of the individual defendants brought with them to Julius Hyman & Company the knowledge and experience acquired during their employment with Velsicol Corporation and utilized the knowledge and experience thus acquired in the manufacture and sale of chlordane by Julius Hyman & Company which, as we have said, was Velsicol Corporation's only competitor in relation thereto.

It further is admitted that all of the applications for patents, both domestic and foreign, herein mentioned, were made by Velsicol's patent attorney at the request or with the knowledge of Dr. Hyman at a time when he was the executive head of Velsicol Corporation, and if any disclosure of trade secrets resulted from said applications, Dr. Hyman is directly responsible therefor.

At the conclusion of all of the evidence on the injunctive feature of the case, the court made and entered its written findings of fact and conclusions of law, the parts of which now pertinent for our consideration are:

" * * * *

"*Further, doth find the issues herein joined in favor of the plaintiff and against the defendants hereinafter named,* and

"Doth further find from a preponderance of the evi-

dence that the defendant Julius Hyman caused to be formed the plaintiff corporation in January, 1931, to exploit his knowledge of chemistry and his experimentations in that field relating to by-products of hydrocarbons, and particularly by-products of petroleum refining and products resulting therefrom; and in consideration of $4,000 in stock, being equivalent to 20% of the capital stock of the corporation, assigned certain United States patent applications to the plaintiff corporation, to-wit, U. S. Serial No. 494204 entitled 'Manufacture of Products containing hydrocarbon substitutes for vegetable drying oils,' and U. S. Serial No. 495422, entitled 'Process for producing polymerized unsaturated hydrocarbons of relatively light color and product thereof.' *And, further, defendant Julius Hyman agreed to devote his time to said corporation as a chemist perfecting the ideas contained in said patent applications, and to devote his time and efforts to develop new uses for petroleum refining by-products at a salary to be agreed upon from time to time as the condition of the company might warrant, and that all inventions and discoveries were to be kept secret and assigned to the plaintiff corporation; that as executive vice-president of the plaintiff corporation, he required from its inception and obtained secrecy agreements from all employees containing a further agreement that all inventions relating to the business of the company should be the property of the company.*

"The Court further finds, from a preponderance of the evidence, that the defendant Julius Hyman thereafter carried out his agreement with plaintiff corporation until October, 1943, when he demanded an increased participation in the company, which failed to materialize, and he abandoned his attempt to withhold certain applications the ideas of which were conceived in the chemical laboratories of the plaintiff corporation of which the defendant Julius Hyman was the executive vice-president in charge of operations; and for which services he received a substantial salary.

"The Court further finds from a preponderance of the evidence that again in July, 1945, the defendant Julius Hyman demanded a greater participation in the company, contending that he was under no further obligation to assign patents or patent applications to the plaintiff corporation. Further, that defendant Julius Hyman refused to assign certain United States patent applications and, more particularly, No. 607076 and 643759, covering a new composition of matter discovered and proved in plaintiff's laboratory, and being an improvement of certain patents owned by plaintiff corporation, known as United States patent applications No. 581172 and 639416, until the plaintiff corporation, and particularly the president and majority stockholder thereof, one Joseph Regenstein, had given him a greater participating interest in said corporation.

"That before and during the time that defendant Julius Hyman was negotiating concerning his acquiring a greater interest in said plaintiff corporation, the plaintiff corporation had expended under defendant Julius Hyman's direction large sums of money testing, proving, developing, manufacturing and advertising the product contained in patent applications Nos. 561172, 639416, and the improvements thereof in patent applications 607078 and 643759, and caused to have registered the trademark 'Velsicol' and the trademark '1068' for said product, which product became known to the trade and the public as 'Velsicol 1068.'

"Further, that said defendant Julius Hyman, while negotiating for an increase in the plaintiff corporation with said Joseph Regenstein, at the end of the year 1945, caused his salary to be increased from $350 per week to $600 retroactive to January 1, 1945, or an increase amounting to $13,000 per year, as executive vice-president of said plaintiff corporation.

"That the defendant Julius Hyman, failing in his effort to coerce the said Joseph Regenstein into giving him a greater participating interest in said corporation, refused

to assign said patent application and resigned as executive vice-president on September 13, 1946, and as a director on October 15, 1946, and thereafter, on or about November 9, 1946, caused to be formed the defendant corporation, Julius Hyman & Company, under the laws of the State of Delaware, to manufacture, market, and distribute the product of the plaintiff corporation known as 'Velsicol 1068,' and since March, 1947, said defendant corporation has been and now is manufacturing, marketing and distributing the plaintiff's property, namely the composition of matter contained in United States Patent Applications Nos. 607078 and 643759 in large quantities, under the trade name of Octa-Klor, at the Rocky Mountain Arsenal, Adams County, Colorado.

"The Court finds that the acts of the defendant Julius Hyman are and were illegal, unlawful, arbitrary and without any basis in law or fact, and in controvention of his agreement with said corporation.

"That the defendant Julius Hyman has wrongfully converted to his own use, *contrary to law and equity,* the property of the plaintiff corporation, to the plaintiff's damage, and is liable in damages therefor.

"The Court, as a matter of law, finds that the fifth defense of the defendant Julius Hyman fails to state a claim against the plaintiff upon which relief can be granted, and the Court is without jurisdiction to determine the plea the defendant Julius Hyman interposed in his fifth defense to the complaint.

"The Court further finds, from a preponderance of the evidence, that the defendants James F. White, Robert Silber, Edward Despres, Dick D'Amore, Steve Pocsik, Fritz Wolf, Charles A. Beckwith, Abe Danish, Henry Dudlak, Ernest Freireich, Rex E. Lidov, William E. McCauley, Thomas McKenna, Roy J. Miller, Yuji Tajima, Simon Zevin and Daniel Bonnell signed secrecy agreements with the plaintiff corporation agreeing both during their employment and after the termination thereof to keep secret the product or products of the plaintiff

corporation unless authorized by writing signed by the president of the company, and

"The Court finds from a preponderance of the evidence that said defendants James F. White, Robert Silber, Roy J. Miller, Edward Despres, Nick D'Amore, Steve Pocsik, Fritz Wolf, Charles Beckwith, Abe Danish, Henry Dudlak, Ernest Freireich, Rex E. Lidov, William E. McCauley, Thomas McKenna, Yuji Tajima, Simon Zevin and Daniel E. Bonnell, and each of them, have breached said secrecy agreement and have been and now are divulging to the defendant corporation, Julius Hyman & Company, the processes, formulas, manufacturing processes, plant plans and trade secrets of the plaintiff corporation, concerning United States patent applications Nos. 581172 and 639416, and the improvements thereof in United States patent applications Nos. 607078 and 643759, and the products thereof known as 'Velsicol 1068,' to the plaintiff's damage, and said defendants are liable in damages therefor.

"That the defendant corporation, Julius Hyman & Company, under the direction of the defendant Julius Hyman, is manufacturing, selling, distributing and advertising a product known as Octa-Klor, and that said Octa-Klor is in truth and in fact the product of the plaintiff corporation known as 'Velsicol 1068,' and infringed upon its copyrighted name by employing the trademark '1068' in its advertising matter published and put in general circulation throughout the United States and foreign countries, to the plaintiff's damage, and is liable in damages therefor; and that said defendant corporation has been and is now unlawfully and illegally using the formula and composition of matter contained in plaintiff's property, namely, United States patent applications 607078 and 643759, and has appropriated the trade secrets of the plaintiff corporation in the manufacture of said product to its own use.

"That the plaintiff has no plain, speedy and adequate remedy at law, and is entitled to equitable relief."

\* \* \*

The findings of fact and conclusions of law were made by the court, and thereafter and on May 28, 1948, it made and entered the following decree:

"The Court having this day made and filed its findings of fact and conclusions of law, it is ordered, adjudged and decreed:

"1. The Court has jurisdiction of the subject matter and the parties.

"2. The complaint is dismissed as to defendants Clyde W. Kearns, Kenneth M. Watson, Charles C. Compton, James A. Bailey, Sidney Bartlett, Laverne Martin, John Montgomery, Carmen Nelson, Beatrice Page Howerton, Anne C. Tovey, Gerald B. Griffin, Harriet Sima Hyman, and Lloyd Joshel.

"3. The equities are with the plaintiff and against the defendants Julius Hyman & Company, Julius Hyman, Robert Silber, Charles A. Beckwith, Daniel E. Bonnell, Nick D'Amore, Abe Danish, Edward Despres, Henry Dudlak, Ernest Friereich, Rex E. Lidov, William E. McCauley, Thomas McKenna, Roy J. Miller, Steve Pocsik, Howard Rosenbaum, Yuji Tajima, James F. White, Fritz Wolf and Simon Zevin, and the plaintiff is entitled to the relief prayed as to said defendants.

"4. Defendant Julius Hyman & Company and its officers, agents and employees are enjoined and restrained forthwith from making and selling·insecticides made by using in any form or manner, in whole or in part, the processes, formulas and products described in and made the subject of applications for United States Letters Patent Serial Nos. 607078 and 643,759, or either of them, or any related application.

"5. Defendants Julius Hyman, Robert Silver, Charles A. Beckwith, Daniel E. Bonnell, Nick D'Amore, Abe Danish, Edward Despres, Henry Dudlak, Ernest Friereich, Rex E. Lidov, William E. McCauley, Thomas Mc-

Kenna, Roy J. Miller, Steve Pocsik, Howard Rosenbaum, Yuji Tajima, James F. White, Fritz Wolf and Simon Zevin are, and each of them is restrained and enjoined forthwith from using the processes, formulas and products described in and made the subject of applications for United States Letters Patent Serial Nos. 581,172, 607,078, 639,416, 643,759, 648,204 and 648,205, or any of them, and from disclosing said processes, formulas and products, or any of them, to Julius Hyman & Company, or to any other person other than plaintiff, and from disclosing any other processes, formulas or products discovered by or revealed to them and each of them while in the employ of plaintiff.

"6. Defendant Julius Hyman & Company, and its officers, agents and employees, and defendants Julius Hyman, Robert Silber, Charles A. Beckwith, Daniel E. Bonnell, Nick D'Amore, Abe Danish, Edward Despres, Henry Dudlak, Ernest Friereich, Rex E. Lidov, William E. McCauley, Thomas McKenna, Roy J. Miller, Steve Pocsik, Howard Rosenbaum, Yuji Tajima, James F. White, Fritz Wolf and Simon Zevin are restrained and enjoined forthwith from using plaintiff's trademarks 'Velsicol', '1068', and 'Velsicol 1068', or either of them alone or in combination with other letters or figures in describing or advertising insecticides, or otherwise, in violation of plaintiff's property rights.

"7. Defendants Julius Hyman & Company, Julius Hyman, Robert Silber, Charles A. Beckwith, Daniel E. Bonnell, Nick D'Amore, Abe Danish, Edward Despres, Henry Dudlak, Ernest Friereich, Rex E. Lidov, William E. McCauley, Thomas McKenna, Roy J. Miller, Steve Pocsik, Howard Rosenbaum, Yuji Tajima, James F. White, Fritz Wolf and Simon Zevin, and each of them are required to account to plaintiff for all damages sustained by plaintiff by reason of wrongful use by said defendants of processes, formulas, methods and trade secrets and trade names belonging to plaintiff, and James M. Sabin is appointed as Special Master, pursuant to

Rule 53 of the Rules of Civil Procedure, to receive evidence respecting the damages sustained by the plaintiff as the result of the acts of said defendants, and with all convenient speed report said evidence to the Court.

"8. Plaintiff shall have judgment against the defendants against whom relief is allowed for its costs incurred and expended and execution shall issue therefor.

"9. Motion for a new trial is dispensed with.

"Entered this 28th day of May, 1948."

In its findings of fact and conclusions of law, entered on April 21, 1948, the court appointed James N. Sabin as master "to receive and report to the Court the damage sustained by the plaintiff corporation as a result of the acts of defendants, and to cause to be audited the books of said defendant corporation, Julius Hyman & Company, * * * concerning the sales of goods, wares and merchandise covered by United States patent applications Nos. 607078 and 643759, and Velsicol 1068 and/or Octa-Klor by the defendant corporation, and the profit derived therefrom, and with all convenient speed report to the Court the audit and findings thereon."

The special master heard many witnesses for both plaintiff and defendants, and from their testimony, supplemented by the audits and records of Julius Hyman & Company, and its answers to interrogatories propounded by plaintiff, as well as those propounded by defendants, filed a lengthy and detailed report, of which the following recapitulation is a part:

| | |
|---|---|
| "Admitted operating profits | $ 664,873.25 |
| Non-deductible salaries and expenses of employees | 60,805.37 |
| Non-deductible research and development expense | 61,083.62 |
| Non-deductible litigation expense | 100,000.00 |
| Non-deductible income taxes | 324,710.30 |
| Non-deductible reserve for depreciation on owned equipment, etc. | 54,952.19 |

| | |
|---|---:|
| Non-deductible reserve for depreciation on leased buildings, etc. | 241,001.76 |
| Non-deductible reserve for doubtful accounts | 37,819.22 |
| Damages by reason of price-cutting by the defendant | 100,000.00 |

aggregating the total amount of $1,645,245.71" ·

Both plaintiff and defendants filed objections to the master's report, and the trial court, after hearing thereon, changed the same in but one item, i. e., "Non-deductible research and development expense $61,083.62" which the court found should be in the sum of $74,901.30 rather than the amount of $61,083.62, found by the master, and in all other respects the objections of both plaintiff and defendants were overruled.

The court thereupon entered its decree on the accounting feature of the case, of which the following is a part:

" * * * The Master's report is confirmed as to the expense items held to be non-deductible for salaries and expenses of employees, for litigation expense, for reserves for depreciation on owned equipment, for replacement of and depreciation on leased buildings and equipment and for doubtful accounts, for income tax payments and reserves. Plaintiff is entitled to an award of $1,559,-063.30 against Julius Hyman & Company for gains and profits realized by it from the appropriation and use of plaintiff's processes, formulas and products for the accounting period ending March 31, 1949, and received and appropriated by it to its use and benefit.

"Wherefore, it is Ordered, Adjudged and Decreed;

"1. Plaintiff shall have and recover from defendants, Julius Hyman & Company, Julius Hyman, Robert Silber, Charles A. Beckwith, Daniel E. Bonnell, Nick D'Amore, Abe Danish, Edward Despres, Henry Dudlak, Ernest Freireich, Rex E. Lidov, William E. McCauley, Thomas McKenna, Roy J. Miller, Steve Pocsik, Yuji Tajima,

James F. White, Fritz Wolf, and Simon Zevin, jointly and severally, damages in the amount of $100,000 for wrongful competition and price-cutting, and execution shall issue therefor as provided by law.

"2. Plaintiff shall have and recover from defendant Julius Hyman & Company $1,558,063.30 on account of gains and profits from the production and sale of Chlordane for the accounting period ending March 31, 1949, realized and received by Julius Hyman & Company and appropriated by it to its use and benefit, and execution shall issue therefor, as provided by law.

"3. That plaintiff shall have and recover judgment against following defendants in the following amount respectively distributed to them by Julius Hyman & Company and received by them as salary and expenses prior to March 1, 1947; Julius Hyman $9,745.28, Robert Silber $3,411.08, Charles A. Beckwith $1,032.60, Daniel E. Bonnell $2,764.64, Nick D'Amore $652, Abe Danish $2,008.93, Edward Despres $2,015.81, Henry Dudlak $1,630.60, Ernest Freireich $2,458.15, Rex E. Lidov $3,054.33, William E. McCauley $2,792.62, Thomas McKenna $1,823.35, Roy J. Miller $6,291.69, Steve Pocsik $1,643.22, Yuji Tajima $1,065.90, James F. White $2,584.31, Fritz Wolf $1,444.79, and Simon Zevin $1,409.60; and the following amounts respectively distributed to them by Julius Hyman & Company and received by them as dividends on preferred stock: Robert Silber $308.20, Charles A. Beckwith $11.52; Daniel E. Bonnell $11.52, Abe Danish $23.93, Edward Despres $170.94, Ernest Freireich $144.85, William E. McCauley $22.71, Roy J. Miller $180.94, Steve Pocsik $4.12, Fritz Wolf $102.14, Simon Zevin $137.22; and from Julius Hyman $15,124.29 owing by him to Julius Hyman & Company at March 31, 1949, and still unpaid; and said sums shall be received by plaintiff in satisfaction *pro tanto* of the judgment for plaintiff against Julius Hyman & Company for gains and profits.

"4. Plaintiff shall have and recover against the de-

fendants, jointly and severally, its costs incurred and expended, and execution shall issue therefor."

Plaintiff has filed three cross specifications of points, but one of which need be considered because no argument is presented in support of two thereof. Plaintiff seeks the affirmance of the judgments and decrees.

On this review defendants summarize and present their specifications under the following:

1. Plaintiff's asserted trade secrets.

2. The secrecy agreements are against public policy.

3. The signatories of the employment agreements are lawfully entitled to disclose and use chlordane or any asserted "know how."

4. Plaintiff is in court with unclean hands.

5. The injunction against the individual defendants is inequitable, indefinite and impossible of performance.

6. The decree and judgment on accounting holds all individual defendants liable and equally liable.

7. The decree and judgment on accounting is not supported by any lawful measure of damage.

█ Attention is directed to the findings of fact and conclusions of law hereinbefore set forth in which the trial court found the *issues* joined in favor of plaintiff and against the defendants, following which there were some specific findings of fact. The general findings on the issues in favor of the plaintiff and against the defendants, with competent evidence in the record to support them, except as the specific findings may depart therefrom, will be construed to extend to and include every fact necessary to support the judgment given thereon. (*Moodie v. Alkire*, 46 Colo. 432, 104 Pac. 1047), consequently the trial court must have found and determined:

That Dr. Hyman was employed by plaintiff from its organization in January, 1931, to September 13, 1946, and was a director and its vice-president and general manager in full charge of its business and affairs in maintaining a laboratory for experimentation, discovery

and invention with reference to resins, insecticides, solvents and other chemical derivatives of hydrocarbon oil. As such general manager he required all employees to enter into employment agreements with plaintiff requiring secrecy and assignment of discoveries and inventions to plaintiff. Defendants, other than Julius Hyman & Company, were former employees of plaintiff, and are now employees of Julius Hyman & Company. Between January, 1931, and July 25, 1945, Dr. Hyman filed forty applications for patents covering processes, products and formulas invented by plaintiff's employees in the course of their employment, and contemporaneously with the applications, assignments thereof were made to plaintiff. Three of plaintiff's employees, while engaged in research work under the direction of Dr. Hyman, discovered a new and valuable insecticide which was the subject matter of application for United States Letters Patent, Serial No. 581172 and duly assigned the same to plaintiff in strict compliance with the terms of their employment agreement. Subsequently the same employees filed a blanket or additional coverage of said application 581172 which became application for United States Letters Patent Serial No. 639416, which was also duly assigned to plaintiff. On July 25, 1945, defendant Dr. Hyman, caused to be filed his application for United States Letters Patent Serial No. 607078 covering insecticides made by the chlorination of the composition of matter covered by said application No. 581172, and the insecticides covered by said application No. 607078 cannot be manufactured without using the processes, products and formulas described in said application No. 581172.

That on January 26, 1946, Dr. Hyman filed his application for United States Letters Patent Serial No. 643759, covering an insecticide made by halogenating the insecticides covered by the processes and formulas described in applications for United States Letters Patent Nos. 581172 and 639416; the insecticides described in ap-

plications for United States Letters Patent Nos. 607078 and 643759 are based upon research and experimentation made by defendants in plaintiff's laboratory, and each of said employees, including Dr. Hyman, was under contract to keep the results of the research and experimentation secret. The composition of matter marketed by plaintiff under its trade name "Velsicol 1068" is that covered by United States Letters Patent Serial Nos. 581172 and 639416 by adding thereto a chlorination process described in United States Letters Patent No. 607078, and the composition of matter described in said applications Nos. 607078 and 643759 cannot be obtained without the utilization of the processes, formulas and products covered by said applications Nos. 581172 and 639416.

That Dr. Hyman caused plaintiff to expend more than $200,000.00 in experimentation and tests and for the promotion of plaintiff's insecticide Velsicol 1068, commonly referred to as chlordane; Dr. Hyman's failure to assign said applications Nos. 607078 and 643759 came to the attention of one of plaintiff's officers in February, 1946, through sources other than Dr. Hyman.

That Dr. Hyman caused Julius Hyman & Company to be organized, and, under his active supervision, to manufacture an insecticide by use of the processes and formulas covered by said applications Nos. 581172 and 639416 and 607078 and 643759, the Julius Hyman & Company product being known as Octa-Klor and chlordane, and the officers and employees of the company had notice and knowledge of plaintiff's interest in said applications by reason of its contractual and equitable rights. Julius Hyman & Company, in addition to the use of the last named four applications in manufacturing insecticides, also is conducting an advertising campaign, making use of the data and tests and other material collected and correlated by plaintiff at a large expenditure; the knowledge and experience possessed by the defendants respecting the processes, formulas and products of the insecticide known as chlordane was gained by de-

fendants while in the employ of plaintiff and while the individual defendants were under contractual and fiduciary relations to keep the said processes, formulas and products in strict secrecy; all of plaintiff's research and experimental work in connection with chlordane was guarded as trade secrets, and the construction of its manufacturing plant and the equipment therein was likewise guarded with secrecy.

That after Dr. Hyman's resignation as plaintiff's executive vice-president and general manager, many reports relating to chlordane and other documents belonging to plaintiff were taken from its files, and Dr. Hyman at that time made false and untrue statements to plaintiff's employees concerning its financial condition, its ability to function without his presence, and the policies and attitude of other directors and officers toward its employees, all for the purpose of inducing plaintiff's employees to leave its employ and accept an extended invitation to become employees of Julius Hyman & Company.

That at Dr. Hyman's suggestion, two of plaintiff's executive or supervisory employees were actively interested in enticing its employees to leave and become employees of Julius Hyman & Company, and, as a result of this enticement, many, if not all, of the other individual defendants were induced to leave plaintiff's employment and enter the employ of Julius Hyman & Company and to use plaintiff's trade secrets, learned by them while in plaintiff's employment, and all thereof conspired among themselves for the purpose of hindering and delaying plaintiff's operations.

That on February 16, 1946, Dr. Hyman filed application for United States Letters Patent, Serial Nos. 648204 and 648205, relating to insecticides, and on various dates thereafter filed in his name, in foreign countries, applications corresponding to said applications Nos. 607078 and 643759 without assigning the same to plaintiff.

That during the year 1945 and the greater part of 1946,

while research and experiments were being made in plaintiff's research and experimental laboratory by its employees, with the composition of the matter covered by applications for United States Letters Patent Serial Nos. 581172, 639416, 607078 and 643759, plaintiff was expending more than $200,000.00 annually in connection therewith.

That the inventions and discoveries covered by said applications Nos. 607078, 643759, 648204 and 648205 were made by Dr. Hyman and other employees of plaintiff in plaintiff's research and experimental laboratory in the course of their employment, at the expense of plaintiff, as a result of numerous experiments and intensive research; the same are plaintiff's trade secrets while said applications for patents are pending, and the technical knowledge respecting insecticides obtained by all of plaintiff's former employees, including Dr. Hyman, was learned while in plaintiff's employment, while under contractual and fiduciary relations with plaintiff, and not otherwise, and no knowledge respecting these insecticides was acquired through any applications for patents either in the United States or any foreign country.

The summarized specifications of points will be considered in their order.

■ ■ 1. In this jurisdiction the trial court is not only the judge of the credibility of witnesses and the weight of the evidence, but of all reasonable inferences properly deducible therefrom. We have held, "On review, the record must be viewed in the light most favorable to the party successful in the trial court and every inference fairly deducible from the evidence is drawn in favor of the judgment." *Gold, Silver & Tungsten, Inc. v. Wallace,* 104 Colo. 273, 287, 91 P. (2d) 975.

■ Defendants take the position that the processes, formulas and products covered by said applications Nos. 581172, 639416, 607078, 643416, 648204 and 648205 are not trade secrets and are in the public domain, and there-

fore defendant Julius Hyman & Company, as well as the individual defendants herein, are at liberty to use the same without interference. In support of this position they assert that it is axiomatic that one may not monopolize matters in the public domain, to which rule they admit two exceptions. The admitted exceptions are: Where one has fully complied with the patent laws, the inventor may, by patent, obtain a limited monopoly for the period of seventeen years, at the expiration of which period the matter comes into the public domain; and, secondly, that an inventor may elect to keep his new invention or discovery of a patentable article or matter secret, and, so long as secrecy is maintained, his property rights in the invention or discovery will be protected against unlawful invasion. When secrecy no longer obtains, the new invention or discovery comes in the public domain. The correctness of defendants' position, as set forth hereinabove, is not here challenged.

Defendants further assert that if the inventor elects to keep his discovery a secret pending the filing of the application for patent, the filing of the application is not a general disclosure so as to make the subject matter thereof public property. However, the grant of a patent thereon is a public disclosure, and the right of secrecy respecting the invention is thereby lost. The correctness of this assertion is likewise not seriously challenged. It is then said that in Great Britain a legal disclosure may exist prior to the granting of a patent, and, inasmuch as patent applications were made in Great Britain, covering the composition of matter disclosed in applications for United States Letters Patent Nos. 581172, 639416, 607078 and 643759, the subject matter of such applications came into the public domain at a date prior to any asserted breach of defendants' employment agreements with Velsicol, and the general disclosure having been made by filing the applications in Great Britain, they were no longer trade secrets, and from the date of the disclosure, plaintiff's rights were limited to those

afforded by the provisions of the patent laws which it invoked by the filing of the applications.

In support of defendants' contention that by reason of the filing of the applications in Great Britain, a public disclosure resulted therefrom which removed the composition of matter covered by the patent applications from the protection afforded trade secrets, the Patents and Designs Acts, 1907 to 1946, Kingdom of Great Britain, were offered in evidence, together with certificates attesting the fact that on February 25, 1946, Velsicol Corporation filed applications for patents numbered 5784 and 5785 of 1946, which applications covered the composition of matter covered by applications for United States Letters Patent Serial Nos. 581172 and 639416, and that the said specifications accompanying the applications were open to public inspection on September 6, 1946.

Defendants also offered a certified document to establish that Dr. Hyman, on the 19th day of March, 1946, filed applications in Great Britain for patents numbered 8475 and 8476 of 1946, together with complete specifications, and that the complete specifications supporting these applications were open to public inspection on January 26, 1947. British applications for patent applications 8475 and 8476, both of 1946, corresponded to the composition of matter covered by applications for United States Letters Patent Serial Nos. 607078 and 643759. Said Patents and Designs Acts, as well as the certificate, were, upon objection, excluded.

It should be observed that even though the applications for letters patent filed in Great Britain covered the composition of matter specified in applications for United States Letters Patent Serial Nos. 607078 and 643759, nevertheless the same could not have amounted to a public disclosure as to these defendants in their activities with Julius Hyman & Company. As evidenced by the certificate, these applications were not open to public inspection until January 26, 1947, and defendants

admit that prior to January 26, 1947, chlordane was being made in the laboratories of Julius Hyman & Company. It is not even suggested here that any defendant learned any of plaintiff's trade secrets through any public disclosure even if such had occurred by reason of the applications for patents in Great Britain, but it is frankly admitted by each defendant who was interrogated with reference thereto that his knowledge of chlordane was limited to that acquired by him in the research and experimental laboratories of plaintiff while in its employ or in its plant, and, with the exception of Dr. Hyman, while he was working under an employment agreement containing a secrecy and assignment provision. It is admitted that while research and experimentation was being conducted with reference to chlordane, every precaution was taken by plaintiff to maintain secrecy, not only with reference to the product chlordane but even as to the construction and equipment of the plant in which the same was manufactured. It also is well to remember that the trial court, in resolving the issues in favor of plaintiff and against defendants, must have determined that Dr. Hyman himself executed one of the employment agreements requiring secrecy and assignment for that was one of the facts alleged and which, if not necessary to support the judgment, nevertheless was competent and relevant thereto. It also should be kept in mind that all the applications for patents made prior to 1945 were filed by plaintiff's patent attorney at the direction or with the knowledge, consent and approval of Dr. Hyman, and the applications for patents here involved, both domestic and foreign, were likewise made at Dr. Hyman's direction or with his knowledge, consent and approval, and if these filings resulted in a public disclosure, it was the result of Dr. Hyman's direction, of which result he and his fellow defendants now seek to take advantage. Without definitely specifying the positions now occupied by each of the defendants in Julius Hyman & Company's organization, and the positions oc-

cupied by these same defendants in plaintiff's organization, suffice it to say that all of the defendants were formerly employed by plaintiff in research and experimental work of a highly technical nature or in the construction and operation of a plant and equipment specially designed to manufacture chlordane. These same defendants occupy positions of relative importance in the Julius Hyman & Company organization.

Defendants, anticipating plaintiff's reliance upon the decision in *Shellmar Products Co. v. Allen-Qualley Co.,* 87 F. (2d) 104, certiorari denied 301 U. S. 695, undertake to distinguish the factual situation there presented from that in the instant proceeding, and assert that if the decision in that case has any controlling effect upon the issues presented here, it is because of language there used which is, in effect, obiter dictum, and would be in direct conflict with the decision of the Supreme Court of the United States in *Scott Paper Co. v. Marcalus Mfg. Co., Inc.,* 326 U. S. 249, 66 Sup. Ct. 101, 90 L. Ed. 47. As we understand the decision in *Scott Paper Co. v. Marcalus Mfg. Co., Inc., supra,* it is inapplicable to the factual situation presented in the instant proceeding.

It would unduly prolong this opinion—already *too* lengthy—if we were to undertake to quote from numerous authorities which clearly support the trial court's determination that the applications for patents here, either domestic or foreign, did not result in a public disclosure and place the same in the public domain in so far as these defendants are concerned.

█ Generally it may be said that a trade secret is any plan or process known only to its owner, and those of his employees to whom it is necessary to confide it. It is not necessary that the plan or process be patentable.

It is our conclusion that the composition of matter embraced in applications for United States Letters Patent Serial Nos. 581172 and 639416, 607078 and 643759 were plaintiff's trade secrets, and defendants' betrayal

of these trade secrets may not be countenanced by a court of equity. Assuming that the applications for patents in Great Britain and other foreign countries amounted to a disclosure of plaintiff's trade secrets, nevertheless it did not relieve the individual defendants here from their contractual and fiduciary obligation. The determination of what, if any, rights the public may have respecting the use of plaintiff's trade secrets by reason of the application for letters patent in Great Britain or elsewhere, we will leave for decision when that question is presented.

The knowledge of chlordane and the construction and equipment of the plant in which the same was manufactured—for which it had expended several hundred thousands of dollars—were, as we have said, plaintiff's trade secrets. Any knowledge which defendants acquired respecting those secrets was obtained while they were plaintiff's employees, and under a contractual obligation, as evidenced by their employment agreements, and in addition thereto this knowledge of plaintiff's trade secrets was acquired by them in confidence and while they were occupying a fiduciary relationship. They now seek to appropriate these trade secrets to their own use and profit by a violation of their contractual agreements and a betrayal of the confidence reposed in them by plaintiff. This they may not do; such conduct is abhorrent to our conception of ordinary honesty. *Shellmar Products Co. v. Allen-Qualley Co., supra; Du Pont De Nemours Powder Co. v. Masland,* 244 U. S. 100, 37 Sup. Ct. 575, 61 L. Ed. 1016; *Marcalus Mfg. Co. v. Sullivan,* 142 N. J. Eq. 434, 60 A. (2d) 330; *Bohlman v. American Paper Goods Co.,* 53 F. Supp. 794; *A. O. Smith Corporation v. Petroleum Iron Works Co.,* 73 F. (2d) 531; *Conmar Products Corp. v. Universal Slide Fastener Co., Inc.,* 172 F. (2d) 150; *Consolidated Boiler Corp. v. Bogue Electric Co.,* 358 Pa. 33, 55 A. (2d) 759; *Junker v. Plumer,* 320 Mass. 76, 67 N.E. (2d) 667; *Picard v. United Aircraft Corp.,* 128 F. (2d) 632, certiorari denied 317

U. S. 651; *Hoeltke v. C. M. Kemp Mfg. Co.*, 80 F. (2d). 912; *Sandlin v. Johnson*, 141 F. (2d) 660; *Stone v. Goss*, 65 N. J. Eq. 756, 55 Atl. 736; *Heyden Chemical Corp. v. Burrell & Neidig, Inc.* (N. J. Eq.), 64 A. (2d) 465; *Larx Co. v. Nicol*, 224 Minn. 1, 28 N.W. (2d) 705; *Jones v. Ulrich*, 342 Ill. App. 16, 95 N.E. (2d) 113; *Paley v. Du Pont Rayon Co.*, 71 F. (2d) 856; 170 A.L.R. 471, et seq.; 28 Am. Jur. p. 303, §110, et seq.; 35 Am. Jur. p. 525, §97; 56 C.J.S. p. 483, §72; 43 C.J.S. p. 750, §148, et seq.; Hopkins on Trademarks, Tradenames and Unfair Competition (4th ed.), p. 255, et seq., §109; 1 Nims, Unfair Competition and Trademarks (4th ed.), p. 419, et seq., §149; 5 Williston on Contracts (Rev. ed.), p. 4623, §1646.

2. The defendants call attention to that part of the employment agreements hereinbefore generally referred to which provides for secrecy and sets forth the following: "The undersigned hereby agrees that at all times, both during his employment and after the termination of his employment he will keep secret all processes, inventions and formulas made known to him by the Company or any of its officers or employee or learned by him while in the employ of the Company and that he will not disclose or make known any of the same or anything relating to the same to any person, firm or corporation except when authorized so to do by *writing* signed by the *President* of the Company."

With reference to this provision of the employment agreement it is said:

" * * * There is no limitation in the foregoing negative covenant as to matters wholly within the field of plaintiff's business or as trade secrets in which plaintiff claims a proprietary right or as to the time within which such covenant shall be effective.

" * * * In substance the covenant imposes a secrecy requirement of such a scope that performance necessarily cannot be enforced without compelling the employee to discontinue his mode of livelihood. * * * "

It should be remembered that the trade secrets

here relate to but one general composition of matter resulting in a specific insecticidate known as chlordane. The composition of matter was, as we have held, a trade secret discovered and invented in plaintiff's laboratories at an expenditure of many hundreds of thousands of dollars and concerning which none of the defendants had any knowledge except that acquired in plaintiff's laboratories and plant. It is generally recognized that the facts in each case must determine the measure of relief to be granted. What our decision might be under different facts and circumstances need not now be considered for here we are concerned with but trade secrets covering a single definite product, and the knowledge of the measures necessarily used in its manufacture. Defendants direct our attention to, and place considerable emphasis upon, the decision in *Super Maid Cook-ware Corp. v. Hamil,* 50 F. (2d) 830, where injunctive relief was sought to enforce two restrictive covenants, under one of which each defendant agreed that: " '* * * he would not for a period of one year, immediately after the termination of this contract, either for himself or for any other person, firm or corporation, either directly or indirectly, sell or attempt to sell any aluminum cookware, or solicit the purchase of the same in any city or community in which he shall have operated under this agreement, and within a radius of one hundred miles of each such city or community,' and under the other that he would not, for the same period enter into such business anywhere within the territorial limits of the United States."

However, therein we find:

"* * * It is only when they [restrictions in employment agreement] are incidental *to some contract which is reasonable in its purpose* and its terms, and *it is necessary to the protection of the rights of the employer under such contract,* that the validity of restrictive covenants will be recognized and enforced, and then only when they are themselves reasonable, no public

interests are involved, and the *restriction is limited to the very point of the necessity of protecting contract rights, to which the covenant is incidental.* * * *

"Further, it is well settled that, while a court of equity will in proper cases issue its writ of injunction to enforce covenants of this kind, it will not do so unless the whole matter appears equitable; that is, unless it rests upon a contract which is fair in its terms, involves no imposition nor injustice, *and the private interests of the employer in the subject-matter of the contract to which the restrictive covenant is incidental, requires in good faith for its protection the enforcement of the covenant.* (citing cases)" (Emphasis supplied)

It should be noted that the appellate court, in affirming the judgment of dismissal entered by the trial court in *Super-Maid Cook-ware Corp. v. Hamil, supra,* stated with reference to the contract there involved: "While the petition of appellant does contain many general allegations of secrets disclosed to, and good will lodged in the hands of, appellees, the *facts as shown by the papers and documents attached to the bill make it perfectly clear that here no secrets of any kind were disclosed, no confidential information was furnished, no good will was lodged in the hands of the appellees, nor was any good will taken by them from appellant. The case is merely one of a restrictive covenant, which depending upon its own terms for its validity, for it has no incidental relation to any contract right of appellants which its enforcement is necessary to protect, must, because of the general prohibition against such contracts, fall.*" (Emphasis supplied)

Defendants also direct our attention to *Fowle v. Park,* 131 U.S. 88, 9 Sup. Ct. 658, 33 L. Ed. 67, and quote therefrom the following, which is a part only of a paragraph: "* * * Public Welfare is first considered, and if it be not involved, and the restraint upon one party is not greater than protection to the other requires, the contract may be sustained. The question is

whether, under the particular circumstances of the case, and the nature of the particular contract involved in it, the contract is, or is not, unreasonable. (Citing cases)"

Counsel neglected to call our attention to the next following paragraph which reads: "Relating as these contracts did to a compound involving a *secret in its preparation;* based as they were upon a valuable consideration, and limited as to the space within which, though unlimited as to the time for which, the restraint was to operate, we are unable to perceive how they could be regarded as so unreasonable as to justify the court in declining to enforce them." (Emphasis supplied)

■ It should be remembered that here plaintiff seeks injunctive relief to prevent defendants from *using* the processes, formulas and products described and made the subject of applications for United States Letters Patent Serial Nos. 581172, 639416, 607078, 643759, 648204 and 648205, all thereof relating to the composition of matter manufactured and sold by plaintiff either under its registered trade name of "Velsicol 1068," or under its common name of chlordane. This composition of matter is manufactured and sold by defendant Julius Hyman & Company under its trade name Octa Klor or chlordane, using in connection therewith the empirical formula C10H6CL8 or the trade mark 1068. The assignments and ownership of the applications and patents are not for our consideration here. Plaintiff bases its cause of action on the contractual and fiduciary relationship existing between the individual defendants while in its employ, during which time the composition of matter embraced by the applcations for patent was invented and discovered in plaintiff's research and experimental laboratory. Whether a provision in an employment agreement requiring secrecy is enforcible, depends upon whether such a contract is reasonable, and this is dependent upon the peculiar facts in each case. Generally it may be said that an agreement by an employee, bind-

ing him to hold secret confidential information or knowledge acquired by him during his employment, and afterwards, and which is necessary for the protection of the employer's business and is reasonable in its terms, will be upheld as valid. *O. & W. Thum Co. v. Tloczynski,* 114 Mich. 149, 72 N.W. 140; *Jones v. Ulrich, supra; Larx Co. Inc. v. Nicol, supra; New Jersey Zinc Co. v. Singmaster,* 4 Fed. Supp. 967, affirmed 71 F. (2d) 277; *Hulse v. Bonsack Machine Company,* 65 Fed. 864; 35 Am. Jur., p. 522, §94, p. 527, §99; 1 Nims, Unfair Competition and Trademarks (4th ed.) p. 419, §149; Hopkins on Trademarks, Tradenames and Unfair Competition (4th ed.) p. 255, §109; 56 C.J.S. p. 486, et seq., §73.

 We conclude that the provision in the employment agreement requiring secrecy is, under the facts here appearing, not void or voidable as against public policy or in restraint of trade.

3. Defendants take the position that if Julius Hyman & Company acquired the information with reference to the processes, formulas and products of chlordane and the manufacture and use thereof *lawfully,* it might use the same without interference subject only to plaintiff's shop rights. In support of this position, they call attention to the decision in *American Dirigold Corp. v. Dirigold Metals Corp.,* 125 F. (2d) 446, and quote the following therefrom: "* * * The discoverer who attempts to keep secret his machine or process of manufacture has no exclusive right to it as against the public, *who uncovers the secret by fair means, or against those who in good faith acquire knowledge of it without the breach of a contract, or of a confidential relationship with the discoverer.*" (Emphasis supplied.) We heartily approve the above statement as a correct enunciation of a principle of law, but frankly state that a most casual reading will convince one of its inapplicability to any factual situation presented here.

In answer to plaintiff's interrogatories, defendants state that defendants Julius Hyman, Robert Silber,

Charles A. Beckwith, Daniel E. Bonnell, Rex E. Lidov, James F. White, Ernest Freireich, Nick D'Amore, Abe Danish, Edward Despres, Henry Dudlak, William E. McCauley, Thomas McKenna, Roy J. Miller, Steve Pocsik, Howard Rosenbaum, Yuji Tajima, Fritz Wolf and Simon Zevin are all stockholders in Julius Hyman & Company.

It is admitted that Dr. Hyman is a stockholder, director and president, and Robert Silber is a stockholder, director and secretary of Julius Hyman & Company, and that all of the defendants were former employees of plaintiff, engaged in research and experimental work, or in the manufacture and use of chlordane, or in the construction of the company's plant and the operation of special equipment therein; that they now are employees of Julius Hyman & Company and engaged in like or similar positions as formerly. We have heretofore determined that all of the defendants acquired some knowledge of plaintiff's trade secrets, and are now, in violation of their contractual and fiduciary relationship with Velsicol, using that knowledge and betraying their trade secrets to Julius Hyman & Company. All the knowledge that that company had with reference to chlordane was acquired through the individual defendants, and it is not here contended otherwise. It is idle to assert, under these facts and circumstances, that Julius Hyman & Company acquired its knowledge of chlordane lawfully. *Stone v. Goss, supra; Vulcan Detinning Co. v. American Can Co.,* 72 N.J. Eq. 387, 67 Atl. 339; 1 Nims Unfair Competition and Trade Marks, p. 431, §154.

Defendants further contend that the employment agreements containing secrecy and assignment provisions entered into by the individual defendants do not preclude them from disclosing their knowledge of chlordane to Julius Hyman & Company. To support their position defendants rely entirely upon technical definitions of hydrocarbons and a technical construction of the employment agreements. Assuming their position to be correct, it avails them nothing for if they are not bound to

secrecy by virtue of their employment agreements, the confidential and fiduciary relationship which they sustained imposed as binding an obligation of guarding plaintiff's trade secrets as would a signed employment agreement, which was definite and unmistakable in its terms and the subject matter thereof.

We conclude that Julius Hyman & Company did not acquire its knowledge of plaintiff's trade secrets in a lawful manner.

4. On this review it is asserted that plaintiff is guilty of acts constituting unclean hands and therefore relief in equity should be denied it. When Varnoil—the name later changed to Velsicol—was organized in 1931, Dr. Hyman received forty shares of its stock; Joseph Regenstein, F. R. Schneider, Henry Degginger and Sidney J. Blum each received one share; Transo Envelope Company seventy-eight shares, and Arvey Corporation seventy-eight shares. Joseph Regenstein was the majority stockholder in Transo Envelope Company and Arvey Corporation and generally controlled their business policies. Joseph Regenstein and Dr. Hyman determined plaintiff's business policies and made its business decisions. Dr. Hyman's salary was increased until in 1943 it was $350.00 per week.

In the fall of 1943 there was an application for patent made by Dr. Hyman and one of Velsicol's chemists, and a controversy then arose between Joseph Regenstein and Dr. Hyman concerning plaintiff's right to an assignment thereof. Dr. Hyman stated that he would not assign the application unless he was given a greater participation in Velsicol, and Joseph Regenstein then said they might as well abandon Velsicol's activities. As a result of this discussion, Dr. Hyman did assign the application, and continued to assign others until 1945, although he was given no increased stock participation in plaintiff; nevertheless, subsequently and during 1945 his salary was increased from $350.00 per week to $600.00 per week, the latter amount being paid him until his resignation on

September 13, 1946. In 1946 another controversy arose between Dr. Hyman and Joseph Regenstein with reference to Dr. Hyman's duty to assign patent applications to Velsicol, culminating in Dr. Hyman's resignation.

There are two inequities claimed by defendant Hyman upon which the unclean hands doctrine is here urged; the first thereof relates to the recapitalization of plaintiff, and the second relates to the refusal of increased participation by Dr. Hyman in plaintiff.

When Dr. Hyman presented his resignation on September 13, 1946, it is admitted that Velsicol Corporation was not then in substantial commercial production of chlordane; it was indebted to Transo and Arvey corporations in the sum of $528,000.00 evidenced by promissory notes and $40,000.00 on open account; it was indebted to a bank in excess of $600,000.00, and Dr. Hyman had committed Velsicol to an additional expenditure in improvements and plans requiring $450,000.00. This indebtedness on September 13, 1946, was all incurred during Dr. Hyman's management and control of the research and experimental work carried on by Velsicol and the construction and equipment of its manufacturing plant. Joseph Regenstein, almost immediately after Dr. Hyman's resignation, consulted plaintiff's bank respecting the payment of the company's financial obligations and securing additional loans to complete its plans and purchases to which Dr. Hyman had committed it. The bankers were reluctant to extend further credit to Velsicol unless its capital was increased and its indebtedness to Transo and Arvey was put into the capital structure of Velsicol. It then was determined by the board of directors that increased capitalization was necessary, and when the resolution adopted by the board to accomplish this result was acted upon by the stockholders, all thereof, with the exception of Dr. Hyman's proxy, voted in favor of an increased capitalization. Each stockholder was afforded the opportunity of purchasing additional shares in Velsicol proportionately with his stock interest therein. Velsi-

col strictly complied with all the statutory provisions relating to the increased capitalization of a corporation. As a result of the action of the stockholders, the par value of Velsicol's stock was decreased from $100.00 to $10.00, and the number of its shares increased from 200 to 100,000. Transo and Arvey converted their indebtedness into Velsicol's capital stock, and by the payment of $16,000.00 in cash acquired 54,400 of the 70,000 shares, the sale of which the stockholders authorized. Dr. Hyman declined to exercise his right to purchase additional shares.

No citation of authorities is necessary to support the generally recognized rule that, in the absence of fraud, the business policies of a corporation, within its statutory objects and purposes, is to be determined by a majority of its stockholders.

As to the second alleged inequity, the trial court found, and there was competent evidence to support the finding, that Dr. Hyman was under a contractual obligation to assign to plaintiff all inventions and discoveries made by him while in its employ. We have said that Dr. Hyman's confidential and fiduciary relations with plaintiff alone were such that he was under a moral and legal obligation to assign applications for patents based upon discoveries, formulas and products made while he was employed by Velsicol. Assuming that Joseph Regenstein had definitely agreed with Dr. Hyman to increase his participation in plaintiff, and assuming that this was based upon a valid consideration, Dr. Hyman's complaint should be addressed to Joseph Regenstein, and any relief to which he was entitled must be from Regenstein and not from Velsicol.

When plaintiff, under Dr. Hyman's direction and supervision, had spent or obligated itself to spend far in excess of $1,000,000.00 in the discovery and invention of processes, formulas and products, out of which the stockholders of Velsicol might derive profits, and then, when this research and experimentation led to the dis-

covery of a product known as chlordane, for Dr. Hyman to disregard his contractual obligation and betray the confidence and trust that had been reposed in him by claiming the discoveries and inventions as his personal property, it ill becomes him to accuse plaintiff of unclean hands.

While we recognize the full import of the unclean hands doctrine, its application here would be a distortion of its fundamental concept.

5. Defendants take the position that the injunctions against them individually are indefinite, impossible of performance and inequitable. They say that by the decree they are restrained in two specific respects, first from "using the processes, formulas and products described in and made the subject of applications for United States Letters Patent Serial Nos. 581172, 607078, 639416, 643759, 648204 and 648205, or any of them, and from disclosing said processes, formulas and products, or any of them, to Julius Hyman & Company or to any other person other than plaintiff * * *" and, second, from "disclosing any other processes, formulas or products discovered by or revealed to them and each of them while in the employ of plaintiff."

Defendants take the position that while the inventors knew the processes, formulas and products described in the applications for patent, the other defendants were in ignorance thereof, and, consequently, could not determine whether they were violating the terms of the injunction. It is true that the processes, formulas and products embraced in the applications and the technical knowledge respecting the manufacture of the same do not appear in the record; nevertheless the specific duties performed by each defendant while employed by Velsicol and as now employed by Julius Hyman & Company are set forth. Each employee had a definite and specific knowledge of some phase of the processes, formulas and products covered by the applications or each had some specific knowledge as to the construction of the plant

and the specially designed equipment therein necessary to produce chlordane.

We note an announcement of Julius Hyman & Company under date of December 15, 1946—which was long prior to the commercial production of Octa Klor by Julius Hyman & Company—of which the following is a part:

"The enclosed booklet described the chlorinated hydrocarbon insect toxicant C10H6CL8. This compound is the discovery of Dr. Julius Hyman, formerly Executive Vice-President of Velsicol Corporation, and now President of Julius Hyman & Company. C10H6CL8 is manufactured and marketed under the trade name Octa-Klor in the company's plant in Denver, Colorado.

"Julius Hyman & Company is composed of a group of scientists, engineers, technicians, and other key personnel who have worked together many years, and who posses the knowledge and competence required to produce C10H6CL8 [chlordane], and the understanding needed to serve the insecticide industry."

Each defendant, as hereinbefore noted, had some knowledge of plaintiff's trade secrets and had used that knowledge in the commercial production of chlordane while in the employ of Julius Hyman & Company. It is this specific knowledge which the individual defendant is now restrained from using in manufacturing chlordane, and it is likewise the same specific knowledge that each defendant is required to maintain secret. It is only by use of this knowledge that plaintiff's rights may be invaded. If the injunction here unreasonably restrains any defendant, or if any defendant is unduly restricted in his employment by reason of its terms, the proper place to secure relief is in the trial court upon proper application, but the injunction here is not void for indefiniteness. *New Jersey v. New York City,* 296 U. S. 259, 56 Sup. Ct. 188, 80 L. Ed. 214; *Regal Knitware Company v. Board,* 324 U. S. 9, 65 Sup. Ct. 482, 80 L. Ed. 667; *In Re United Gas Corporation,* 162 F. (2d) 409.

6. Defendants contend that the decree and judgement on the accounting feature of the case is void because it holds all individual defendants equally liable for damages found to have been sustained by reason of the activities of Julius Hyman & Company in connection with its manufacture of chlordane. The court below based its finding of individual liability on a breach of contract, that is the breach of the employment agreement, and declined to fix any liability based on a violation of a fiduciary relationship. We, however, have held that the fiduciary relationship existing between the individual defendants and Velsicol was just as obligatory as were the employment agreements themselves.

Some complaint is indicated because a judgment was rendered against certain of the individual defendants, while others, occupying similar, if not identical, relationship with Velsicol, were dismissed. Granted its truth, it does not negative the liability of those against whom a judgment was rendered.

The trial court by its judgment and decree found the issues joined in favor of plaintiff and against the defendants, and one of the issues was whether a conspiracy and confederation existed between the defendants to injure plaintiff. The stated facts clearly demonstrate that there was competent evidence upon which the court might properly base its finding of a conspiracy and confederation, and the general rule of law is that joint wrongdoers, as these individual defendants are found to be, are jointly and severally liable for the entire injury and damage resulting from their joint acts committed in furtherance of the conspiracy. *Schreiber v. Burton, Trustee,* 81 Colo. 370, 256 Pac. 1; *Meek v. Smith,* 59 Colo. 461, 149 Pac. 627. There was competent evidence from which the court determined that a conspiracy and confederation existed between defendants to disclose plaintiff's trade secrets and to interfere with its lawful business by unfairly competing in the sale of

plaintiff's product, all which resulted in its damage, for which each defendant is liable.

7. The report of the master and the modification and approval thereof made by the trial court have been heretofore set forth. Defendants' objection to the judgment on the accounting questions:

A. The Liability of defendants for damage.

B. The liability of the corporate defendant for profits.

C. Specific errors with respect to the proceeding on accounting:

 (1) Income taxes—$324,710.30

 (2) Salaries and expenses of employees—$60,805.37

 (3) Reserve for doubtful accounts—$37,819.22

 (4) Depreciation of owned equipment — $54,952.19

 (5) Reserve for depreciation on government owned property—$241,001.76

 (6) Research and development expense — $75,101.30

 (7) Certain special items which should be deducted from profits:

 a. $76,440.44 income tax adjustment with respect to non-chlordane expense

 b. $57,371.32 interest on invested capital

 c. $74,040.62 net income from premium on sales of refined Octa Klor.

We will pass upon these objections in the order in which they are listed.

Before doing so it is well to bear in mind the judgment and decree of the court on the injunctive feature of the case. The court had entered its findings of fact and conclusions of law, as hereinbefore set forth, on April 21, 1948; its judgment and decree—as previously stated—on May 28, 1948, and the master began hearing evidence on May 23, 1949, as to the damages sustained by the plaintiff corporation as a result of the acts of the

defendants and the profits derived by the defendant corporation from the sale of Velsicol 1068 or Octa Klor.

At the time the master began his hearing on the accounting, the court, in its judgment and decree on the injunctive feature of the case, found the *issues* joined in favor of the plaintiff and against the defendants. Under our decision in *Moodie v. Alkire, supra,* by this finding the court determined:

That the composition of matter embraced by the said applications for patents was the trade secret of plaintiff, and each of the defendants was under a contractual and fiduciary obligation to assign to plaintiff all inventions and discoveries made or learned by him during his employment, and to maintain secrecy with reference thereto.

That defendants entered into a conspiratory and confederation to organize Julius Hyman & Company with intent to injure, hinder and delay plaintiff in its business of manufacturing the composition of matter known as chlordane, and in the sale of the same.

That the officers and agents of Julius Hyman & Company entered into a conspiracy to entice plaintiff's chemists and technical employees into leaving plaintiff's employment and joining them in their conspiracy and revealing to them plaintiff's trade secrets and the methods used in its manufacture, and this with notice and knowledge of the contractual obligation of secrecy into which these former employees of Velsicol had entered.

That the applications for patents made by Dr. Hyman covered the composition of matter which was plaintiff's trade secret, and is being manufactured and sold by Julius Hyman & Company as Octa Klor.

That the plaintiff has expended more than $200,000.00 in developing chlordane, perfecting methods of manufacturing and producing this product, and in advertising and building up a market for the same, and that Julius Hyman & Company is appropriating and pirating the benefits and results of said expenditures.

 Defendants call attention to the fact that plaintiff requested the court to amend its findings of fact by inserting therein, "that apart from the agreement [employment agreement], by reason of their [employees] status of employment in confidential relations, they were also bound." This amendment the court denied, stating: "The evidence showed that they signed these [employment agreements] and that is the basis for their contract of employment, and that is what the Court found." As we construe this action of the court, it did not amount to a finding that the fiduciary or confidential relationship between plaintiff and its employees did not exist and impose an obligation. We have hereinbefore determined that each defendant in this case occupied a fiduciary relationship with plaintiff which imposed an obligation of secrecy equivalent to that of any contractual obligation. If the judgment is right, even though founded on a wrong theory, it will not be disturbed on review. *Noble v. Canon City*, 73 Colo. 374, 215 Pac. 867.

A. The master found that plaintiff had been damaged in the sum of $100,000.00 by reason of defendant's unfair competition, and this finding the court approved. There was evidence to establish that as a result of defendants lowering the prices for chlordane, and the rebate and floor stock adjustment plan, a loss greatly in excess of the amount found by the master and approved by the court would properly be allowable.

Rule 53. Masters. R.C.P. Colo., provides for the appointment of a master and supersedes sections 232, 233 and 234 of our former Code of Civil Procedure, which code sections were applicable to referees. By comparison we find rule 53 and code sections 232, 233 and 234 are substantially the same.

 In this jurisdiction the rule announced in *Noble v. Faull*, 26 Colo. 467, 58 Pac. 681, is that where the referee hears evidence and makes findings thereon, and his findings are approved by the trial court, they are entitled to the same weight and are just as binding on us

as the verdict of a jury. This rule is followed in the federal courts in *Dickinson v. O. & W. Thum Co.*, 8 F. (2d) 570, and *Girard Insurance A. & T. Co. v. Cooper*, 162 U. S. 529, 16 Sup. Ct. 879, 40 L. Ed. 1062.

Defendants labor under the impression that their liability is limited entirely to damages resulting from a breach of contract. In this they are mistaken for in the complaint it is charged, and as we have heretofore shown, that the evidence established that defendants violated their confidential and fiduciary relationship, as well as their contractual. They all have been found guilty of being coconspirators in a plan to injure plaintiff and appropriate its property to their own use and benefit, and equity having acquired jurisdiction, it retains jurisdiction to give such complete relief as the facts require. *Cuddigan v. San Juan Fed'n*, 110 Colo. 97, 130 P. (2d) 923; *Aladdin Mfg. Co. v. Mantle Light Co. of America*, 116 F. (2d) 708.

It is admitted that plaintiff and defendants were the only manufacturers of the product chlordane. It is asserted that chlordane was an insecticide more effective in its use than any other on the market. There is competent evidence to the effect that defendants lowered the price of chlordane, and, by reason thereof, presented a competitive situation requiring plaintiff to meet the lowered price or discontinue its business. There is evidence that in addition to lowering the price of chlordane defendants adopted a rebate and stock adjustment plan which placed them in an additional advantageous position unless plaintiff also adopted this same plan; there also is evidence in the record that because of the lowering of the price of chlordane and other advantages given by defendants, Velsicol lost business which it otherwise might have enjoyed; there is evidence that Julius Hyman & Company lowered its price of chlordane because of competition with other insecticides. However, this competition is wholly unavailing to defendants because it has been found that they were engaged in manufactur-

ing and selling chlordane wrongfully and in violation of plaintiff's rights, and what business policy was to be followed in the face of competition with other insecticides was a matter for plaintiff here, and not for defendants, to determine. It is concededly impossible for plaintiff to produce competent evidence to show with a mathematical exactitude just what its loss was in dollars and cents by reason of defendants' business methods. However, that fact alone does not deprive plaintiff of its right to damages as is contended by defendant. In this case plaintiff is entitled to damages in an amount which it would have realized from the sale of chlordane at reasonable prices except for the wrongful and deliberate interference of defendants.

 Under the evidence the master found, and the trial court adjudged, that plaintiff had been damaged, although the exact extent thereof is not definite and certain. The rule is that damages based upon mere speculation and conjecture are not allowable; however where it has been definitely established that damages are traceable to and the direct result of a wrong, the uncertainty as to the amount thereof is a question for determination by the trier of the facts. Any other rule would result in rewarding a wrongdoer. *Eastman Kodak Co. v. Southern Photo Materials Co.,* 273 U. S. 359, 47 Sup. Ct. 400, 71 L. Ed. 684; *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U. S. 555, 51 Sup. Ct. 248, 75 L. Ed. 544. The uncertainty as to the proof of the exact amount of damages suffered by plaintiff does not preclude a recovery. *City and County of Denver v. Bowen,* 67 Colo. 315, 184 Pac. 357; *Westesen v. Olathe State Bank,* 75 Colo. 340, 225 Pac. 837; *United States National Bank v. Bartges,* 120 Colo. 317, 210 P. (2d) 600; *Matarese v. Moore-McCormack Lines, Inc.,* 158 F. (2d) 631.

Under the evidence in the instant case, the fact that plaintiff has been damaged is certain; the only uncertainty existing is the extent of the damage. It was found by the master—and this finding was approved by the

court—that the amount which plaintiff should recover by reason of defendants' unfair competition and price reduction, in one form or another, is $100,000.00, and this finding we shall not disturb.

B. By the judgment and decree on accounting, plaintiff "shall have and recover from defendant Julius Hyman & Company $1,559,063.30 on account of gains and profits from the production and sale of chlordane for the accounting period ending March 31, 1949, realized and received by Julius Hyman & Company and appropriated by it to its use and benefit, * * *." It is defendants' position that in entering this judgment the trial court misconceived the applicable law. In this connection they say: "In considering this award, it must be kept in mind that the liability found by the Court below was a breach of contract. No tort liability, based upon confidential relationship was found by the Court below. Nor was any specific finding made as to unfair competition or passing off or trespass to support a tort liability so that, as we have pointed out, plaintiff's recovery, if any recovery is warranted under this record, is limited to damages, * * *." Further defendants assert: "In trade secret cases, for example, profits are awarded where there has been a violation of confidence and in such cases, as the Court held in De Filippis v. Chrysler Corporation, 53 Fed. Supp. 977, affirmed 159 F. (2d) 478, the defendant is required to give up his profits not on the theory of the use of the trade secret but for the violation of confidence. * * *"

From these general statements of defendants we are led to conclude that they admit that if there is competent evidence in the record to support unfair competition and a violation of confidence, a tort liability may be incurred, in which case judgment for the amount of profits realized by defendants from the sale of chlordane would be proper.

In the complaint it was charged, and in the answer denied, that defendants had practiced unfair competition

and had violated confidence, and the trial court, by its general findings in favor of plaintiff, resolved these questions in its favor, so that, under defendants' own theory of the case, the profits realized by Julius Hyman & Company from the sale of chlordane was a proper basis for the court's judgment.

We have read and studied the case of *DeFilippis v. Chrysler Corporation*, 53 F. Supp. 977, from which defendants, in their brief, have quoted at length. That was an action for an injunction and accounting based on the unauthorized use of plaintiff's invention which embraced a transmission mechanism. The trial court dismissed the complaint on the ground that "there could be no implied contract to pay for a device *not novel nor used by the defendant*." (Emphasis supplied.) All that was said therein with reference to plaintiff's burden of proof, in view of the reason given for the dismissal, was dictum, and in 159 F. (2d) 478; certiorari denied 331 U. S. 848; the concluding sentence in the paragraph affirming the trial court reads: " * * * It follows that defendant used nothing which plaintiff disclosed, and the decision below must be affirmed." We are at loss to understand what comfort defendants find in this case.

In *Horlick's Malted Milk Corporation v. Horluck's Inc.*, 51 F. (2d) 357, cited by defendants, it was held by the district court:

"Conceding that a court of equity, in a proper case, may decree the recovery of his profits from a defendant, the question still remains, Has it been shown by the requisite amount of evidence that the conduct of the defendant herein has been so culpable—so willfully fraudulent—as to merit such decree?

\* \* \*

"Plaintiff is entitled to an injunction and its damages, because it has been shown to be so entitled by a fair preponderance of the evidence. It cannot recover defendant's profits unless it has been shown beyond a

reasonable doubt that defendant was guilty of willful fraud in the use of the enjoined trade name."

On appeal, 59 F. (2d) 13, the judgment, with a slight modification, was affirmed. In the opinion it is stated: " * * * It is to be remembered that there was no *direct competition between plaintiff and defendant, and the testimony of plaintiff's own witnesses was to the effect that defendant's acts have not deprived it of any sales of its production.*" (Emphasis supplied.)

It therefore was determined that there being no evidence of lost sales, plaintiff was not entitled to an accounting of damages.

In *Rubber & Celluloid Harness Trimming Co. v. F. W. Devoe & C. T. Reynolds Co.*, 233 Fed. 150, the converse of the situation in the present case was found, and there it was held that, although plaintiff was entitled to an injunction and its costs and damages, it was not entitled to an accounting for profits because the unfair competition was not so wilful and fraudulent as to justify punitive, in addition to compensatory, damages. In the instant case, by the general finding, the unfair competition was wilful and fraudulent, and an accounting for profits under this decision would be proper.

The title to the patents hereinbefore mentioned has been determined by the Supreme Court of Illinois in *Velsicol Corporation v. Hyman, supra.* In our present inquiry we are limited to the right of plaintiff to injunctive relief and damages resulting from the use of plaintiff's trade secrets. The following decisions, having to do with patents and infringements, present situations which make them particularly applicable to the factual situation here: *Hamilton-Brown Shoe Co. v. Wolf Brothers & Co.*, 240 U. S. 251, 36 Sup. Ct. 269, 60 L. Ed. 629; *Mishawaka Rubber & Woolen Manufacturing Company v. Kresge Co.*, 316 U. S. 203, 62 Sup. Ct. 1022, 86 L. Ed. 1381; *Aladdin Mfg. Co. v. Mantle Light Co. of America, supra; Computing Scale Co. v. Toledo Computing Scale Co.*, 279 Fed. 684, certiorari denied 257 U. S. 657.

It further is contended by defendants that before a profit-award can be sustained, the evidence must show that the whole of the profit is attributable to the appropriated property and that since the record does not show trade secrets are alone responsible for defendant's profits, they cannot be used as the basis of a judgment. Defendants assert that their new plant and improved engineering features contributed largely to the profits disclosed by their audit. If such were the case, the burden of establishing the amount of the contribution was upon defendants wherein this knowledge was reposed, and not upon plaintiff, and since the record discloses little, if any, research in the manufacture of chlordane prior to its production in quantities by Julius Hyman & Company, any knowledge of improvements must necessarily have been that acquired by defendants' employees while engaged by plaintiff.

In this case there was but one product upon which the judgment was based, and here, as we have said, Julius Hyman & Company was plaintiff's only competitor in the manufacture of chlordane. Under the facts presented, the net profits realized from the sale of chlordane by Julius Hyman & Company, when ascertained, were properly included in the judgment.

C. (1) According to the audit reports for the years ending March 31, 1948, and March 31, 1949, defendant Julius Hyman & Company had a federal and state income tax liability amounting to $324,710.30, which the master and the trial court disallowed as a deduction from operating profits realized from the sale of chlordane.

For the year ending March 31, 1948, a tax liability in the sum of $60,765.77 is shown for the 1947-1948 federal and state income taxes, and the audit report for the fiscal year ending March 31, 1949, discloses a liability for 1948-1949 federal and state income taxes in the sum of $263,944.53. We shall accept the statement of counsel for defendants that these taxes have been paid. The

master, in his report, disallowed a deduction for such taxes, basing his determination on the decisions in *L. P. Larson, Jr. Co. v. Wm. Wrigley, Jr. Co.*, 277 U. S. 97, 48 Sup. Ct. 449, 72 L. Ed. 800; and *Sheldon v. Metro-Goldwyn Pictures Corporation*, 106 F. (2d) 45, affirmed 309 U. S. 390, 60 Sup. Ct. 681, 84 L. Ed. 825, and the report was approved by the court.

We heretofore have determined that plaintiff is entitled to the operating profits realized by Julius Hyman & Company from its manufacture and sale of chlordane, and if Velsicol received the entire operating profits without the deduction of any federal or state income taxes, it would, of course, be obligated to pay them. The question here is whether or not the sum total of the state and federal income taxes is deductible from the profits to which plaintiff is entitled. In *L. P. Larson, Jr. Co. v. Wm. Wrigley, Jr. Co., supra,* it was held that Larson was entitled to the total net profits without deduction of federal income and excess profit taxes, and this was the sole question presented to the supreme court where this judgment was affirmed. Therein it is said that, "No doubt there are cases in which such a deduction [federal income and excess profit taxes] would be proper." However, it was held, in effect, that the Wrigley Company was culpable of "conscious and deliberate wrongdoing." In *Sheldon v. Metro-Goldwyn Pictures Corporation, supra,* it was held that income taxes paid by defendants were not deductible because the defendant was a "conscious wrong-doer." On certiorari to the United States Supreme Court, the judgment was affirmed, 309 U. S. 390. In *Goodyear Tire & Rubber Co. v. Overman Cushion Tire Co.*, 95 F. (2d) 978, dismissed 306 U. S. 665, 59 Sup. Ct. 459, 83 L. Ed. 1061, it was held that a deduction for income taxes on profits earned should be not permitted because the finding of conscious and deliberate infringement by Goodyear was fully warranted by the evidence.

The question posed here is whether, under the facts

presented, defendants were "conscious and deliberate wrongdoers" or wrongdoers which would justify us in holding the income taxes paid as a non-deductible item. In order to make this determination, the factual situation here presented must be considered. Dr. Hyman had made applications for four patents and had refused on demand of Mr. Regenstein to assign these patent applications to Velsicol unless he was given a greater participation in the corporation. Dr. Hyman's demand for a greater participation in the corporation was not acceded to, and his refusal to assign his patent applications led to a controversy which in August, 1946, became more or less heated, and continued until the date of his resignation on September 13, 1946. In an attempt to ascertain his legal rights and obligations, Dr. Hyman consulted his attorneys, and testified, "I put up to this firm my entire relationship with the Velsicol Corporation and asked them for an opinion as to whether, in the first place, I was bound by my relationship with the company to assign patent inventions to the company, and, secondly, I asked them to assist me in my negotiations for working out the difference between Mr. Regenstein and myself." And, without objection, Dr. Hyman testified, "my attorneys had told me I was not bound to assign the patent applications."

On October 16, 1946, an action was begun by Velsicol in the Superior Court of Illinois to compel Dr. Hyman to assign the patent applications here involved, resulting in a judgment for plaintiff; thereafter on appeal to the Appellate Court (338 Ill. App. 52), the judgment was reversed, Dr. Hyman being successful; in March, 1950, the Supreme Court of the State of Illinois announced its decision reversing the judgment of the Appellate Court and affirming the judgment of the Superior Court (*Velsicol Corp. v. Julius Hyman*, 405 Ill. 352, 90 N.E. (2d) 717). The Supreme Court of the United States denied certiorari (339 U. S. 966, 70 Sup. Ct. 1002, 94 L. Ed. 1374).

The bitterness engendered by Dr. Hyman's refusal to assign the patents and Regenstein's refusal to grant him a greater participation in the corporation undoubtedly resulted in another action between Dr. Hyman and Velsicol Corporation in which the increased capitalization of Velsicol was involved. In this litigation Dr. Hyman was successful in the Superior Court, which entered a judgment setting aside the recapitalization. On appeal to the Illinois Appellate Court, the judgment of the Superior Court was reversed. *Hyman v. Velsicol Corp.*, 342 Ill. App. 489, 97 N.E. (2d) 122.

Dr. Hyman testified that he relied upon the advice of his attorneys, and, somewhat embittered by what he believed to be unjust and unfair treatment by plaintiff, began his plans to exercise what he says he believed his rights to be under his patent applications, and this he did openly and without any attempt whatever to conceal his activities. Under these circumstances we conclude that the income taxes paid by Julius Hyman & Company may be deductible from the operating profits upon its complying with conditions hereinafter set forth. *Stromberg Motor Devices Co. v. Detroit Trust Co.*, 44 F. (2d) 958; *Ruth v. Stearns-Rogers Mfg. Co.*, 13 F. Supp. 697; *Macbeth-Evans Glass Co. v. L. E. Smith Glass Co.*, 23 F. (2d) 459; *Alfred Bell & Co. Ltd. v. Catalda Fine Arts Inc.*, 86 F. Supp. 399; *Stromberg Motor Devices Co. v. Zenith-Detroit Corp.*, 73 F. (2d) 62; *W. W. Sly Mfg. Co. v. Pangborn Corp.*, 276 Fed. 971, affirmed 284 Fed. 217, certiorari denied 260 U. S. 749.

In this respect the judgment nevertheless will be affirmed unless Julius Hyman & Company shall, within twenty days from the date of final judgment herein, enter into a bond with good and sufficient sureties, acceptable to the plaintiff or approved by the District Court, in the penal sum of $300,000.00, conditioned upon Julius Hyman & Company diligently and in good faith taking all appropriate steps and proceedings to get whatever relief is available to it under the laws of the

United States and the laws of Colorado, by reason of the change in its income status resulting from the entry and execution of the decree of accounting in this case, by way of refund, deduction or other benefit, and accounting for and paying to plaintiff the full amount of any refund received or of any amount allowable to it as a deduction or of any other benefit received by it in the form of a credit to its income tax liability or otherwise, for the fiscal years 1947-48 and 1948-49, such payment to plaintiff not however to exceed $324,710.30. *Ruth v. Stearns-Rogers Mfg. Co., supra; Stromberg Motor Devices Co. v. Detroit Trust, supra; W. W. Sly Mfg. Co. v. Pangborn Corp., supra; Macbeth-Evans Glass Co. v. L. E. Smith Glass Co., supra.*

(2) The master recommended that salaries and expenses paid prior to March 1, 1947, in the amount of $60,805.37 to various employees of Julius Hyman & Company, who were former employees of plaintiff, should not be allowed as a deduction from the operating profit of the defendant corporation. The recommendation of the master was approved by the trial court, and this action of the court, defendants contend, constituted error. Julius Hyman & Company was incorporated, as we have said, under the laws of Delaware in November, 1946; authorized to do business in the State of Colorado in December, 1946; obtained its lease on a portion of the Rocky Mountain Arsenal on January 7, 1947, for a term commencing February 1, 1947; began its operations in the latter part of February, 1947; and its first production was March 14, 1947. It did little, if any, experimental or research work in connection with chlordane prior to March 1, 1947; in fact, in December, 1946, its published announcement was in part:

"Julius Hyman & Company is composed of a group of scientists, engineers and other key personnel who have worked together for many years, *and who possess the knowledge and competence required to produce C10H6-*

*CL8, and the understanding needed to serve the insecticide industry.* * * *

· "The physical plant which Julius Hyman & Company has acquired is adequately equipped for large scale production of Octa Klor." (Emphasis supplied.)

We shall accept Julius Hyman & Company's announcement as a correct statement of the facts.

There is an exhibit in the record, consisting of forty-seven pages, itemizing the salaries and expenses of the officers and employees of Julius Hyman & Company from the beginning of operations in 1946 until January 1, 1949. The exhibit discloses the total monthly expense broken down into items, i. e., hotel, meals, transportation, communication, entertainment, courtesies and incidentals for the period of time mentioned above, and also the salary paid each of the defendants during the same period of time. Keeping in mind that possession under the lease was to begin on February 1, 1947, we are unable to understand what contribution scientists, chemists, engineers, technicians and other key personnel could make in the manufacture and production of chlordane prior to the time that possession of the premises was had. All of the defendants were found to be coconspirators; all were found to have violated their contractual and fiduciary obligation; all were either scientists, chemists, engineers, technicians or other key personnel "who possess the knowledge and competence required to produce C10H6CL8." Under these conditions some evidence should be forthcoming from defendants, explaining and justifying salaries paid for the month of October and succeeding months prior to the commencement of Julius Hyman & Company's operations in the manufacture of chlordane, which, according to Dr. Hyman began the latter part of February, 1947.

Defendants, in urging error in the exclusion of these expenses and salary items, call our attention to one decision, *Aladdin Mfg. Co. v. Mantle Lamp Co., supra.* We note that here the master bases his disallowance of

these expenses and salary items on the decisions in *Aladdin Mfg. Co. v. Mantle Lamp Co., supra,* and *Duro Co. v. Duro Co.,* 56 F. (2d) 313. Neither of these decisions is directly in point, but they tend to support plaintiff's, rather than defendants', position.

Defendant's conduct has not been such as to commend them to a court of equity; furthermore it is not incumbent upon this court, under the presentation here, to search through a long, detailed statement; consisting of forty-seven pages, to glean therefrom items which may or may not have been properly considered as deductible.

The trial court did not err in approving the master's report, recommending that the salaries and expenses of the individual defendants here paid prior to March 1, 1947, be not allowable as deductions.

(3) The audit report for the fiscal year ending March 31, 1949, shows total notes and accounts receivable, trade $793,711.13, less reserve for doubtful accounts and notes receivable $37,819.22. The master in his report, and the court in its judgment, disallowed the sum of $37,819.22 as a deduction from profits. It should be borne in mind that the product being manufactured by Julius Hyman & Company was plaintiff's. Julius Hyman & Company saw fit to manufacture and sell plaintiff's product, and, according to the audit, extend credit to its customers. Julius Hyman & Company, in extending credit, was doing so at its own risk, and if a loss is sustained as a result thereof, that loss is not chargeable to plaintiff. The collectible or noncollectible status of these credit accounts is a matter which concerns Julius Hyman & Company alone. No error was committed in disallowing this item.

(4) The audit report for March 31, 1949, contains an item of $54,952.19 as a reserve for depreciation on Julius Hyman & Company's machinery, equipment and other items. This sum, Julius Hyman & Company contended, was an item for which it should be allowed credit against

the gross profits realized by it from the sale of chlordane. The same audit report contains the items: machine parts and repairs for 1949 $5,622.79; replacement of pipes, valves, fittings, etc. $14,078.91—this item in the 1948 audit report appears as $7,330.46; and for repairs, machinery and equipment in 1948 $8,527.15, making a total of $35,559.31. These items, it must be assumed, were purchased and installed for the purpose of keeping the machinery used in the plant in operable condition, but nowhere does it appear that they were charged against the reserve for depreciation. It would be improper, as we view it, to charge for depreciation on the machinery and equipment used in manufacturing chlordane, and at the same time charge all repairs as expense. This view was shared by the master and the trial court, and we believe that both were correct in disallowing $54,-952.19 as reserve for depreciation on the machinery and equipment under the facts disclosed by the audit.

(5) The March 31, 1949, audit report, under liability reserves, shows this item: "For repairs and replacement of government lease property $241,001.76."

The auditors, with reference to this item, made this comment: "A contingent liability for additional income taxes exists, should the Bureau of Internal Revenue, in its examination of the current and prior years income tax returns, require that for income tax purposes there be an adjustment of the reserve for repairs and replacement of government-owned property leased to Julius Hyman and Company. This contingent liability for income taxes is not reflected in the above balance sheet."

We construe this statement as an indication that the auditors entertain a doubt as to the allowance of this item of depreciation, and we share in that doubt.

As we have said, Julius Hyman & Company, on January 7, 1947, entered into a lease agreement with the United States Government for the term February 1, 1947, to February 1, 1952, and in the audit report we are informed, "that an amendment to the original lease con-

tains a provision for an option for a period of twenty years, and we are further informed that this proposed amendment has been properly approved by government authorities in Washington."

On February 1, 1947, the valuation of the buildings and tanks and machinery and equipment leased to Julius Hyman & Company was determined. The valuation of the buildings and tanks was $654,000.00, the machinery and equipment $381,126.00, and the buildings and tanks leased by a supplemental lease agreement $128,900.00. In the audit report of March 31, 1948, there was a reserve "for repairs and/or replacement of government-property $108,925.20." and in the audit report of March 31, 1949, a reserve for "repairs and/or replacement of government property $114,673.10." The repairs and replacement of government property for the period February 1, 1948, to March 31, 1949, is estimated at $17,403.46. It is disclosed in the audit report that in arriving at a total of $241,001.76 as a reserve, the buildings and tanks were depreciated at the rate of five per cent; the machinery and equipment at the rate of twenty per cent. In arriving at this percentage of depreciation, the auditors make this comment:

"Such a provision is an estimate only, the accuracy of which can be determined only at the expiration of the lease agreement. According to U. S. Army Engineers any appraisal would be meaningless inasmuch as certain chemical reactions occurring within pipes and tanks, etc. would not, in all cases, be immediately determinable.

"In connection with the provisions for such replacement it should be noted that this charge to operations was deducted in computing the amount of federal and state income taxes for the current year [1948]. A determination has not been made as to whether or not this deduction will be allowed under current income tax regulations by taxing authorities. Should this amount be disallowed as a deduction the resulting additional income tax would approximate $50,600.00 more than the

amount of $60,765.77 shown by the financial statement presented."

A like comment as quoted above is contained in the audit report of March 31, 1949.

The burden was upon defendants to show the proper amount allowable as a deduction for depreciation, and in view of the fact that the auditors themselves qualify these reserves for depreciation, and in fact express some doubt as to their allowance as proper, neither the master nor the trial judge erred in disallowing these items.

(6) In answer to interrogatories, Julius Hyman & Company have charged against the gross sales of chlordane the sum of $101,258.98 as research laboratory expense chargeable to the production thereof. On the hearing before the master, he determined that the following charges were not allowable:

| | |
|---|---:|
| Research expense on other patent matters currently in controversy (quinones and quinone adducts) | $18,958.62 |
| Dr. David Gottlieb duplication | 500.00 |
| Dr. Clyde W. Kearns | 3,750.00 |
| Kansas State College | 10,000.00 |
| University of Illinois | 5,500.00 |
| A. S. Behrman | 10,800.00 |
| Stanley J. Christol, University of Colorado | 3,300.00 |
| F. Herbert Gates, Colorado State Entomologist | 4,375.00 |
| Clyde W. Kearns | 3,900.00 |
| Total disallowed | $61,083.62 |

To the master's report on this research and laboratory expense, both plaintiff and defendants objected. The objections of defendants were overruled, and the objections of plaintiff were likewise overruled with the exception of one which was "sustained." In this objection plaintiff insists that the master should have included $9,375.00 paid to Dr. Kenneth Watson for consultation

fees; $4,325.00 paid to Clyde W. Kearns as selling expense, and $18,242.68 listed as research laboratory expenses for the months of November and December, 1946, and January and February, 1947. Plaintiff's objection having been granted, the court, by its decree and judgment on accounting, notwithstanding the fact that no additional evidence was taken, substituted for the master's findings on deductible items the following:

| | |
|---|---:|
| Clyde W. Kearns | $ 7,650.00 |
| A. S. Behrman | 10,800.00 |
| Kenneth Watson | 9,375.00 |
| Herbert Gates | 4,375.00 |
| University of Illinois | 5,500.00 |
| Non-chlordane research | 18,958.62 |
| Research laboratory expenses from November, 1946, to February, 1947 | 18,242.68 |
| Total disallowed | $74,901.30 |

With reference to the above, the record discloses: *Clyde W. Kearns*—$7,650.00. Included in the court's disallowance of $74,901.30 is an item of $7,650.00 paid to Clyde W. Kearns, which amount is challenged by plaintiff. It appears in all that Dr. Kearns was paid the sum of $15,300.00, of which $7,650.00 was concededly not chargeable to chlordane. Plaintiff insists that because of the fact that Dr. Kearns had formerly been a consultant for Velsicol, and, shortly after Dr. Hyman's resignation, had left it and became a consultant, director and stockholder of Julius Hyman & Company, that $7,650.00 should also be disallowed. So far as the record reveals, the evidence is that the $7,650.00 was for services performed by Dr. Kearns in determining the resistance of insects to chlordane and analytical work in connection therewith. This item was properly chargeable to the production and sale of chlordane.

*A. S. Behrman*—$10,800.00. His salary from February 1, 1947, to March 1, 1949, is charged as $10,800.00. Ac-

cording to Dr. Hyman, Col. Behrman's "duty with us has been in connection with the improvement in our hypochloride manufacture, and in keeping us abreast of issued patents in the trend of insecticide patents." and that none of his ideas have been put into effect. This disallowance was approved by both the master and the trial court, in which approval we concur.

*Kenneth Watson*—$9,375.00. Dr. Watson had a retainer of $5,000.00 per year from Julius Hyman & Company, the first payment being made on January 15, 1947, and the last on March 1, 1949; total $12,500.00, of which amount $9,375.00 was charged to research laboratory expenses in connection with chlordane. Dr. Hyman testified in answer to a question as to Kenneth W. Watson's contribution to the production and sale of chlordane, "He has made some valuable suggestions which has helped us reduce our costs." Notice was served on defendants that strict proof would be required with reference to Dr. Watson's contribution to the production and sale of chlordane, and no further material evidence respecting this matter was offered. The court disallowed the item of $9,375.00 as a charge against the production and sale of chlordane, which action we approve.

*Herbert Gates*—$4,375.00. He was the Colorado State Entomologist, and was paid a monthly salary of $175.00 by Julius Hyman & Company, totaling $4,375.00. With reference to his contribution to the production and sale of chlordane, Dr. Hyman testified that Gates contributed nothing to the production of chlordane, but he was helpful in connection with the sale of chlordane by promoting its use in Colorado for the improvement of agriculture in the state; however, that this promotion was a part of his duties as a state official. Both the master and court disallowed this item of $4,375.00 as a charge against the production and sale of chlordane, and in this ruling we concur.

*University of Illinois*—$5,500.00. The defendants ad-

mit that an error was committed in including this item as a charge in the production and sale of chlordane.

*Non-Chlordane Research*—$18,958.62. This item was included in an answer to plaintiff's interrogatories, showing the research expense applicable to the production and sale of chlordane in the sum of $101,258.98. However an examination of the complete answer discloses that this item was for "Research expense on other patent matters currently in controversy (quinones and quinone adducts)," and the court determined that it was not chargeable to the production and sale of chlordane. We approve this determination.

*Research Laboratory Expense*—$18,242.68. Answers to interrogatories propounded by plaintiff, disclosed that there was $18,242.68 spent during the months of November and December, 1946, and January and February, 1947, for research laboratory expenses which defendants charged to chlordane, whereas the evidence in the record is to the effect that the research laboratory "began operations in a research sense about the middle of March, 1947." The master did not include this last item in his report, but the trial court did so in its judgment and disallowed the same as a charge in the production and sale of chlordane, and we approve.

Julius Hyman & Company have charged the sum of $101,258.98 as research laboratory expenses in the production and sale of chlordane. We conclude that Julius Hyman & Company improperly included the following items as an expense chargeable to the manufacture and sale of chlordane:

| | |
|---|---:|
| A. S. Behrman | $10,800.00 |
| Kenneth Watson | 9,375.00 |
| Herbert Gates | 4,375.00 |
| University of Illinois | 5,500.00 |
| Non-chlordane Research | 18,958.62 |
| Research laboratory expense | |
| Nov. 1946 to Feb. 1947 | 18,242.68 |
| | $67,251.30 |

The correct amount chargeable to research laboratory expenses on account of the production and sale of chlordane is $101,258.98 minus $67,251.30 or $41,657.68. The judgment is modified accordingly.

(7) Defendants contend that profits realized from the production and sale of chlordane should be reduced by: a. the sum of $76,440.44, which is said to be an income tax adjustment with respect to non-chlordane expense; b. $57,371.32 interest on invested capital; c. $74,040.62 net income on sales of refined Octa Klor.

a. The audit report for the year ending March 31, 1948, discloses a current liability for federal and state income taxes in the sum of $60,765.77. With reference thereto the audit report contains the following: "A contingent liability of approximately $50,600.00 additional income taxes exists should the Bureau of Internal Revenue in its examination of the current and prior years income tax returns disallow the deduction of the Contingency Reserve for Repairs and Replacements of government-owned property leased to Julius Hyman & Company. This contingency liability is not reflected in the above balance sheet."

In the audit report for the year ending March 31, 1949, under the head of current liabilities, there appears "1948-49 Federal and State Income Taxes $263,944.53," indicating that the federal and Colorado income taxes due from Julius Hyman & Company for its two years operation have remained unpaid. The 1949 audit report also contains a statement with reference to a contingent liability for additional income taxes.

Under the condition of the record it is impossible at this time for us to determine the exact tax liability of Julius Hyman & Company for state and federal income and other taxes.

b. Defendants urge an allowance of interest on invested capital in the sum of $57,371.32, which, they contend, should be deducted from operating profits. In answer to one of plaintiff's interrogatories, we are ad-

vised that the total consideration for sale of stock was $333,134.00, and, so far as the record discloses, this sum comprised all of the assets that Julius Hyman & Company possessed on or about March 31, 1947. Assuming that this sum, in its entirety, became a capital investment of Julius Hyman & Company, defendants would be entitled to interest thereon (*Seabury v. Am Ende,* 152 U. S. 561, 14 Sup. Ct. 683, 38 L. Ed. 553; *Western Glass Co. v. Schmertz Wire Glass Company,* 226 Fed. 730; *Producers' & Refiners' Corporation v. Lehmann,* 18 F. [2d] 492), and this for a period of two years (March 31, 1947 to March 31, 1949). Interest computed at the rate of six per cent would entitle defendants to a credit as against the profits of $39,976.08.

With reference to interest, the master found, and the court approved, the following: "As suggested by plaintiff in its brief, no allowance of interest on money invested by Julius Hyman & Company or on the retained profits employed in the business, will be allowed, for any such allowable interest would be more than offset by the interest allowable to plaintiff on the retained profits." Plaintiff has filed its cross specification of points to the allowance of interest on defendants' capital investment, stating that "Defendant, Julius Hyman & Company, is not entitled to interest on capital employed in willfully and unlawfully injuring plaintiff in its business, and plaintiff is entitled to interest on gains wrongfully received and retained by defendants."

According to the audit reports, the profits realized by Julius Hyman & Company from the sale of chlordane in the fiscal year ending March 31, 1948, was $119,-637.35, and the profits thus realized during the fiscal year ending March 31, 1949, were $396,590.14. There were many items aggregating a very considerable sum used in the audit report as deductions which we have determined were not allowable. The computed interest on the retained profits based on the audit report is in excess of $38,000.00, and with proper disallowances in

Julius Hyman & Company's audit report under the heading of liability and reserves, the increase in the net income for this two-year period with interest computed thereon would greatly exceed any interest properly allowable to Julius Hyman & Company on its capital investment.

Under these circumstances, with the approval of plaintiff, no change need be made in the master's report or in the judgment on account of this item.

c. Refined Octa Klor, according to the record, is refined chlordane, and it appearing in the record that the refinement of this product resulted from research and experimentation in the unwarranted and unauthorized use of the processes, formulas and inventions which were plaintiff's trade secrets, no error was committed in disallowing this item.

Defendants in an answer to plaintiff's interrogatories, admit that the total sales of chlordane to March 31, 1949, amount to $4,012,224.76, and the total of compounds containing chlordane during the same period $149,669.78; also receipt of $12,086.01 from the sale of raw materials, containers and scrap. Julius Hyman & Company was, during the period here involved, engaged in the manufacture of chlordane, and, as hereinbefore noted, repairs and replacements were charged to and properly allowable as expenses. Therefore, the raw materials, containers and scrap presumably were purchased with moneys realized from the sale of chlordane and should be added to the gross sales. The correct total gross proceeds chargeable to Julius Hyman & Company, we conclude, is $4,173,980.55.

In answer to plaintiff's interrogatories, the gross expenses chargeable to the production and sale of chlordane, it is claimed by defendants, was $3,497,021.29, leaving, according to plaintiff's own answer, an admitted net profit of $676,959.26.

The court in its judgment disallowed an item of $7,-650.00 paid to Clyde W. Kearns for his services in

research and development expense. The record discloses that Dr. Kearns received a total of $15,300.00 from Julius Hyman & Company charged to research and development of chlordane. The record also discloses that half thereof, i. e., $7,650.00 only was charged to chlordane research and development, and this amount we find as a proper charge. This correction in the judgment necessitates a subtraction from the $74,901.30 of $7,650.00, making the non-deductible research and development expense disallowed as a charge against the production and sale of chlordane in the sum of $67,251.30.

The profits and gains properly chargeable to Julius Hyman & Company are:

| | |
|---|---|
| Admitted operating profits | $ 676,959.26 |
| Non-deductible salaries and expenses of employees | 60,805.37 |
| Non-deductible research and development expense | 67,251.30 |
| Non-deductible litigation expense | 100,000.00 |
| Non-deductible income taxes | 324,710.30 |
| Non-deductible reserve for depreciation on owned equipment, etc. | 54,952.19 |
| Non-deductible reserve for depreciation on leased buildings, etc. | 241,001.76 |
| Non-deductible reserve for doubtful accounts | 37,819.22 |
| | $1,563,499.40 |

We have concluded that the sum of $1,563,499.40 is due plaintiff from Julius Hyman & Company as gains and net profits realized by it from the production and sale of chlordane.

Paragraph 2 of the judgment and decree on accounting, entered by the trial court on May 11, 1950, is accordingly modified and amended so as to read as follows:

"2. Plaintiff shall have and recover from defendant Julius Hyman & Company $1,563,499.40 on account of gains and profits realized and received by it from the

production and sale of chlordane for the accounting period ending March 31, 1949, and appropriated by it to its use and benefit, and execution shall issue therefor as provided by law; provided, however, if Julius Hyman & Company shall, within twenty days from the date of the final judgment herein, enter into a bond in the penal sum of $300,000.00 with good and sufficient sureties acceptable to plaintiff or approved by the Court, conditioned that Julius Hyman & Company shall diligently and in good faith take all appropriate steps and proceedings to get whatever relief is available to it under the laws of the United States or the laws of Colorado, by reason of the change in its income status resulting from the entry and execution of the decree of accounting in this case, by way of refund, deduction or other benefit, and promptly account for and pay to plaintiff any refund, deduction or other benefit received by or accruing to it in relation to its income tax liability for the fiscal years 1947-48 and 1948-49, then plaintiff shall have and recover from Julius Hyman & Company $1,238,789.10, for which execution shall immediately issue as provided by law, plus whatever amount, not exceeding $324,710.30, Julius Hyman & Company shall ultimately realize by reason of any refund, deduction or other benefit in the adjustment of its income tax liability for the fiscal years 1947-48 and 1948-49, or related credits or benefits received in the computation of its tax liability."

The judgment and decree of the district court on the injunctive feature of this action, made and entered on May 28, 1948, is affirmed; and the judgment of the district court on the accounting feature of this case, made and entered on May 11, 1950, as herein modified, is affirmed.